*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0195P (6th Cir.)
File Name: 04a0195p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

GREGORY THOMPSON,
  *Petitioner-Appellant,*

  *v.*

RICKY BELL, Warden,
  *Respondent-Appellee.*

No. 00-5516

———————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 98-00006—R. Allan Edgar, Chief District Judge.

Decided and Filed: June 23, 2004

Before: SUHRHEINRICH, MOORE, and CLAY, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Dana C. Hansen Chavis, FEDERAL
DEFENDER SERVICES, Knoxville, Tennessee, for
Appellant. Jennifer L. Smith, OFFICE OF THE
ATTORNEY GENERAL, Nashville, Tennessee, for
Appellee. **ON BRIEF:** Dana C. Hansen Chavis, FEDERAL
DEFENDER SERVICES, Knoxville, Tennessee, for
Appellant. Jennifer L. Smith, OFFICE OF THE

---

ATTORNEY GENERAL, Nashville, Tennessee, for
Appellee.

  MOORE, J., delivered the opinion of the court, in which
CLAY, J., joined. SUHRHEINRICH, J. (pp. 7-105),
delivered a separate opinion concurring in part and dissenting
in part.

———————————

### OPINION

———————————

  KAREN NELSON MOORE, Circuit Judge. Eighteen
months ago, this panel in a split decision producing three
different opinions affirmed the decision of the district court
granting summary judgment to respondent in this habeas
corpus action. Judge Suhrheinrich later conducted sua sponte
a second, thorough review of the record and came to the
conclusion that the facts as adduced in deposition testimony
not part of the district court record supported the granting of
the writ. *See infra* (Suhrheinrich, J., concurring). Upon
reviewing the deposition of Dr. Faye Sultan, and investigating
the procedural complications of this case, it is clear that this
extremely probative testimony requires that we vacate the
district court's grant of summary judgment in favor of
respondent.

  Judge Suhrheinrich summarizes most effectively the Sultan
deposition and its value in assessing Gregory Thompson's
mental state at the time of the crime. Where his opinion goes
too far is in its accusations of fraud on the court; while his
explanation for the omission of the Sultan deposition from the
official record before the court is possible in the narrowest
sense, the power of this court should not be used to make
such accusations without more definite proof than the factual
record of this case reveals.

Dr. Sultan's deposition was taken by trial counsel for respondent, but was not included with the evidence submitted as part of Bell's motion for summary judgment. Slightly more than one year later, contemporaneous with the preparation of this appeal, appellate habeas counsel made a Rule 60(b) motion in the district court asking to include the Sultan deposition as part of the record. At the same time, Thompson's counsel submitted that deposition to this court as part of his motion to hold this appeal in abeyance during the pendency of the Rule 60(b) motion. Applying the principle of Occam's razor, we conclude that more than likely, a genuine mistake was made, one which was not realized until a different attorney looked at the case. To conclude otherwise is to disbelieve sworn testimony by an officer of the court, and to assume that habeas counsel conspired to conceal evidence beneficial to their client, for no discernible reason — evidence loses power, rather than gains it, by being revealed on the "eve of execution" in a second habeas petition. Reading Judge Suhrheinrich's opinion, one might conclude that this court had only recently unearthed the Sultan deposition, when in fact it was submitted to the panel prior to oral argument as part of the abeyance motion.

We did not consider it, however, in rendering our decision, believing ourselves to be bound by the record created in the district court. Upon reflection, and after reviewing Judge Suhrheinrich's forceful assessment of the probity of the Sultan deposition, we believe it is appropriate to use our inherent equitable powers to expand the record on appeal to consider the deposition. Ordinarily, a court of appeals should only consider evidence made part of the district court record. Where through error or accident material matters are omitted or misstated, Federal Rule of Appellate Procedure 10(e) allows correction of the appellate record to include the corrected material. *See Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012 (6th Cir. 2003). While some circuit courts have held that Rule 10(e) allows the inclusion of material the district court did not consider, *see In re Capital Cities/ABC, Inc.'s Appl. for Access to Sealed Trs.*,

913 F.2d 89, 97 (3d Cir. 1990) (citing inconsistent circuit precedent); *United States v. Aulet*, 618 F.2d 182, 187 (2d Cir. 1980), the rule in this circuit has consistently been that Rule 10(e) does not allow such inclusion. *See, e.g., Inland Bulk*, 332 F.3d at 1012; *S & E Shipping Corp. v. Chesapeake & Ohio Ry. Co.*, 678 F.2d 636, 641 (6th Cir. 1982). We adhere to our previous interpretation that Rule 10(e) does not allow inclusion in the appellate record of material that the district court did not consider.

Although Rule 10(e) is thus unavailable, we recognize that a number of our sister circuits have held that the courts of appeals have the inherent equitable power to supplement the record on appeal, where the interests of justice require. *See United States v. Kennedy*, 225 F.3d 1187, 1192 (10th Cir. 2000) ("[U]nder some circumstances, we have an inherent equitable power to supplement the record on appeal. However, we conclude the present case" does not present those circumstances.); *Ross v. Kemp*, 785 F.2d 1467, 1474 (11th Cir. 1986) (relying on *Dickerson*, *infra*, and exploring circumstances under which exercise of that power is appropriate); *Gibson v. Blackburn*, 744 F.2d 403, 405 n.3 (5th Cir. 1984) ("Although a court of appeals will not ordinarily enlarge the record to include material not before the district court, it is clear that the authority to do so exists."); *Dickerson v. Alabama*, 667 F.2d 1364, 1368 (11th Cir. 1982) (relying on court's inherent equitable powers to supplement the record in habeas case); *Turk v. United States*, 429 F.2d 1327, 1329 (8th Cir. 1970) ("[I]n the interest of justice, this court may order the record enlarged."); *Gatewood v. United States*, 209 F.2d 789, 792-93 & n.5 (D.C. Cir. 1953) (sua sponte ordering preparation of transcript for record "in the interest of both parties, and of the due administration of justice"); *see also* Charles Alan Wright et al., *Federal Practice & Procedure* § 3956.4, at 349-51 (3d ed. 1999 & Supp. 2003) ("In special circumstances, however, a court of appeals may permit supplementation of the record to add material not presented to the district court."); 20 *Moore's Federal Practice*, § 310.10[5][f], at 310-19 (3d ed. 2000) ("In extraordinary

situations, the circuit court may consider material not presented to the district court when it believes the interests of justice are at stake."). Although recent Sixth Circuit cases indicate that we have not yet "embraced the notion that the record can be supplemented under an appellate court's equitable authority," *see Inland Bulk*, 332 F.3d at 1012, in at least one earlier state habeas case we have so supplemented the record, citing to *Dickerson*, 667 F.2d at 1367. *See Prather v. Rees*, 822 F.2d 1418, 1420 n.1 (6th Cir. 1987) ("Although the parties did not provide the court with copies of the state court briefs, this court may supplement the record when necessary."); *see also Adams v. Holland*, 330 F.3d 398, 405-06 (6th Cir. 2003) (recognizing exception to Rule 10(e) in habeas cases: "where substantial portions of [the state trial transcript] were omitted before the District Court, a habeas case should be remanded to the District Court for consideration in light of the full record."). Because the evidence here was apparently negligently omitted, because the evidence is so probative of Thompson's mental state at the time of the crime, because there is no surprise to respondent as it was his counsel who took the deposition, and because this is a capital case, we believe that the circumstances of this case merit consideration of the Sultan deposition pursuant to our equitable power to supplement the record on appeal, despite the omission of the deposition from the District Court record. We therefore vacate the grant of summary judgment, and remand the case to the District Court for a full evidentiary hearing.

It remains to be explained the source of our power to so reconsider our earlier opinion, as we do not join in Judge Suhrheinrich's allegation of fraud on the court. Instead, we rely on our inherent power to reconsider our opinion prior to the issuance of the mandate, which has not yet issued in this case. Although a court of appeals should withdraw an already-issued mandate only to prevent a miscarriage of justice, *see Calderon v. Thompson*, 523 U.S. 538 (1998), at least two of our sister circuits have reconsidered opinions where the mandate has not yet issued. *See Wilson v. Ozmint*,

357 F.3d 461, 464 (4th Cir. 2004) ("The mandate of the court has not yet issued in this case, and, therefore, we may, at our discretion, 'amend what we previously decided . . . .'" (quoting *Alphin v. Henson*, 552 F.2d 1033, 1035 (4th Cir. 1980)); *First Gib. Bank v. Morales*, 42 F.3d 895, 898 (5th Cir. 1995) (relying on *Alphin*, 552 F.2d at 1035, to reconsider decision where mandate had not yet issued). We therefore rely on our inherent power over a case until our mandate issues in reconsidering our opinion in this case.

The judgment of the district court is therefore **VACATED**, and the case is **REMANDED** for further proceedings not inconsistent with this opinion. Thompson's execution is also **STAYED** for 180 days to permit the district court to proceed.

## CONCURRING IN PART, DISSENTING IN PART

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.

### I. Introduction

Petitioner-Appellant Gregory Thompson ("Thompson" or "Petitioner") was convicted of first degree murder and sentenced to death by the State of Tennessee. In a previous decision, this Court affirmed the district court's denial of his request for a writ of habeas corpus. *See Thompson v. Bell*, 315 F.3d 566 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 804 (2003). The Supreme Court denied Thompson's petition for writ of certiorari. On February 25, 2004, the State of Tennessee granted the State's motion to set an execution date and has ordered that the Warden of the Riverbend Maximum Security Institution or his designee execute the sentence of death on August 19, 2004, "unless otherwise ordered by this Court or other appropriate authority." This matter is now before this Court on its own motion.

Essential to our conclusion that Thompson was not denied effective assistance of counsel due to counsel's failure to introduce evidence that he suffered from schizophrenia at the time of the offense was our finding that Thompson "has never submitted *to any court* any proof that he suffered from severe mental illness at the time of the crime." *Thompson,* 315 F.3d at 590. Subsequent to the issuance of our decision on January 9, 2003, information has come to the attention of the Court which requires us to determine whether our decision to affirm the district court's denial of Thompson's petition for writ of habeas corpus relief from his death sentence was improvident.

While reviewing various Sixth Circuit death penalty cases in preparation of a law review article on the subject, an intern

in my chambers, who also happens to be a board-certified psychiatrist, expressed concern as to why Thompson's post-conviction expert, Gillian Blair, Ph.D., and Thompson's habeas experts, Barry Crown, Ph.D. and Faye Sultan, Ph.D., had not directly addressed the question as to whether Thompson did or did not exhibit symptoms of a major mental illness at the time of the crime or sentencing, and, if he did, whether the symptoms were sufficient at that point to support a diagnosis of mental illness which should have been presented as mitigating evidence at the sentencing hearing. I then conducted my own review of the entire certified record, in addition to my prior review of the joint appendix. As a result of my review of the entire certified record, I feel that it is incumbent upon me, as a judicial officer sworn to uphold the Constitution, and as authoring judge of the initial opinion, to reverse that ruling and issue this opinion. Although I am now merely a concurring/dissenting judge in this matter, I wish it to be known that the initiative for this decision came from my chambers. The majority's ruling is based upon their review of my draft opinion, prepared after my discovery, and the hundreds of hours of work that followed, reviewing the entire record, researching the law, and drafting this opinion.

The question thus is whether our prior ruling was mistaken, because there is, and was, in fact available proof that Thompson was suffering from a serious mental disease or defect at the time of the 1985 offense which would have substantially impaired his ability to conform his conduct to the requirements of law.[1] Also at issue, and integral to the

---

[1] The Tennessee Code Annotated, § 39-13-204(j) lists as a mitigating factor:

(8) The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of a mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affect the defendant's judgment[.]

Tenn. Code Ann. § 39-13-304(j)(8) (2003).

primary question, is whether the federal habeas counsel in this case committed fraud on the court by intentionally or recklessly failing to present critical evidence on the question, of which they had knowledge, to the district court. For the reasons that follow, we vacate our prior ruling and conditionally grant the writ.

## II.  Background

The facts are set forth in great detail in our prior opinion. *See id.*  However, because the present inquiry involves voluminous facts and procedural history not presented to us on appeal as part of the joint appendix, it is necessary to revisit much of the case, and to review and present the new materials.  To the extent possible, I have attempted to present the relevant facts in chronological and procedural order.

### A. State Court Proceedings

### 1. Trial Court

Brenda Lane was murdered on January 1, 1985. Thompson was apprehended the next day. On January 29, 1985, the trial court appointed counsel. On February 26, 1985, less than two months after the murder, counsel filed a notice of insanity defense and also requested a mental or psychological evaluation of Thompson to determine (1) whether Thompson was competent to stand trial, and (2) his mental capacity at the time of the crime. On March 25, 1985, less than three months after the murder, trial counsel filed a supplementary motion for a psychiatric examination and a neurological examination to determine (1) whether Thompson was competent to stand trial and assist counsel with his defense, (2) whether Thompson was suffering from a mental illness on the date of the offense, and (3) whether Thompson was in need of hospitalization for further psychiatric treatment and evaluation. The affidavit in support stated that Thompson had previously suffered two concussions, one when he was sixteen years old from a car accident, and the second while in

the Navy, when he was beaten in the head with a hammer by three fellow servicemen.

On March 28, 1985, less than three months from the date of the offense, the trial court ordered that Thompson be referred to the Multi-County Mental Health Center for a forensic evaluation to determine (1) his competency to stand trial and to assist in his own defense, and (2) his mental capacity at the time of the crime.  On April 4, 1985, the trial court entered another order directing Thompson to undergo a forensic evaluation at a state facility, Middle Tennessee Mental Health Institute ("MTMHI"), for a maximum of thirty days.  A team of forensic psychologists at MTMHI evaluated Thompson and found him to be competent.

Trial counsel questioned the state team's impartiality and requested funds to secure further psychiatric evaluations.  On July 29, 1985, the trial court granted counsel funds to hire an independent psychiatrist.  Instead, counsel used the funds to hire Dr. Copple, a clinical psychologist.  Trial counsel stated that the effort to hire a psychiatrist "was not successful."  *Id.* at 573.  Also as part of their trial preparation, counsel traveled to Thompson's home town where they interviewed various family members and acquaintances of Thompson.

Thompson did not present a defense at trial, and the jury convicted him of the first degree murder of Brenda Lane.  At the sentencing phase, Thompson's former girlfriend, Arlene Cajulao, testified that she knew Thompson from 1980 until June 1984.  She described Thompson as caring and sensitive.  On cross-examination, she testified to incidents concerning Thompson's violent behavior while in the Navy.  Thompson's sister, Nora Jean Walton, testified about his activities in Georgia upon his return from Hawaii after his discharge from the Navy. Dr. Copple also testified. He stated that he spent roughly eight hours examining Thompson over several sessions.  Copple stated that during the first session, he was basically looking at what things Thompson would be capable of doing in a prison setting.  Copple testified that, in

his opinion, Thompson had an unusually strong need to nurture other people that had impelled him to some unwise actions. Copple felt that Thompson did not have an adult anti-social personality disorder. On cross-examination Copple stated that he did not think Thompson was suffering from any mental illness.

The State presented in rebuttal the deposition testimony of Dr. Robert Glenn Watson, who had participated in the staff evaluation of Thompson at MTMHI. Watson found no intellectual impairment. Watson also testified that they found no real evidence of organicity or brain damage. Watson also administered the Minnesota Multiphasic Inventory-II ("MMPI"), but determined that the tests results reflected malingering. Watson further stated that on May 24, 1985, at a staff conference, based on all the data, the staff concluded that:

> [Thompson] exhibited none of the signs of an affective illness. His judgment and insight are rather poor. Psychological testing revealed him to be functioning in the average range intellectually, to exhibit no signs of organicity or brain damage on the Bender-Gestalt Test and the Bender Interference Procedure. Personality profiles revealed no evidence of a psychosis, but indicated malingering in the mental illness direction. (For example, the schizophrenic score was at T 120, while clinical observations revealed no evidence of a thought disorder.)

The staff at MTMHI diagnosed Thompson as Axis 1, Adult Antisocial Behavior, 071.01. The forensic team therefore concluded that Thompson was mentally competent to stand trial and was not suffering from a mental disease or defect.

The jury imposed the death penalty at the conclusion of the penalty phase, and the trial court entered judgment sentencing Thompson to death by electrocution. Thompson thereafter pursued his direct appeals to no avail.

### 2. Post-Conviction

On October 16, 1990, Thompson filed a petition for post-conviction relief, claiming in relevant part that trial counsel failed to investigate adequately Thompson's background and personal and medical history for the existence of mitigating evidence. *See Thompson*, 315 F.3d at 576. On February 1, 1991, post-conviction counsel filed an *ex parte*, sealed motion seeking "funds to hire a licensed psychologist or psychiatrist and an investigator to assist in the preparation of his case for post-conviction relief." *Id.* at 577. In support, counsel attached the affidavit of Dr. Gillian Blair, a clinical psychologist. Blair noted that Thompson's post-incarceration medical records indicated that Thompson had been variously diagnosed as having bipolar affective disorder, schizo-affective disorder, and schizophrenia, paranoid type, and was taking Lithium, Haldol, and Cogentin. *Id.* Blair opined that "[i]f Mr. Thompson is found to be suffering from neurological or psychological impairment as described above, it is likely that some degree of such impairment would have existed at the time of the offense and would have been a significant factor in determining whether or not Mr. Thompson was able to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law when he committed the homicide of which he stands convicted." *Id.* Blair indicated that Thompson needed a full psychological evaluation. *Id.*

The state trial post-conviction court held an evidentiary hearing on March 27 and March 29, 1995. At the hearing Blair testified that she reviewed Thompson's institutional records, beginning with the 1985 MTMHI assessment. She also interviewed Thompson in March and April 1992, and at that time administered "a basic psychological battery of tests with some additional . . . neuropsychological tests because of the history of head injuries that Mr. Thompson had received and that were well documented in his medical record." *Id.* at 578-79. Blair then articulated the following opinion:

The Riverbend medical record indicated that since 1985, Mr. Thompson had shown a deteriorating mental status. He had become psychotic. He had been treated with anti-psychotic medication at that time. He was treated with Haldol, Cogentin, and Lithium, and three different treating physicians at that time: Dr. Dyner [sic], Dr. Deal, and Dr. Humble had all over the years from 1985 to 1990 had diagnosed him as either having bipolar disorder or a schizo affective disorder or schizophrenia. They described his agitated behavior. They described his hostility. They described his inappropriate affect, his experience of auditory hallucinations, his delusions, his paranoia, his thoughts of persecution. He had attempted suicide of a couple of occasions. He had set fire to his cell burning both his hands and his face. They had certainly–two of those psychiatrists and maybe all three of them had considered the possibility that he was malingering, that he was faking mental illness and throughout their Riverbend records, it was clear that those psychiatrists had discounted the possibility of malingering because they didn't feel that it accounted for all of the psychotic symptoms they saw in him.

*Id.* at 579.

Blair was also asked what other facts would be necessary for her to develop an opinion as to Thompson's condition at the time of the offense. She stated that "the most important thing that would be necessary would be a full history and full medical records of Mr. Thompson prior to the commission of the offense." *Id.* She added that:

From the records I was able to review, it was clear that the social history was very sketchy in terms of his remote history, his childhood and his upbringing, and also family history of mental illness. There seemed to be a [sic] strong evidence to suggest that there was mental illness in his family, probably in his father who committed suicide and was known to be extremely

violent and possibly in his mother but none of those records were available.

*Id.* Blair therefore stated that she did not have an opinion about Thompson's diagnostic

status in 1985. *Id.*

On cross-examination, Blair stated that she had reviewed all of the records included in the files from MTMHI. This included daily progress notes, medication sheets, the report of psychological testing, the discharge summary, the admission summary, the staff conference report, and the social worker's history. *Id.* When asked whether she thought MTMHI's testing procedure was unreliable, she averred that it was not unreliable, but simply "not extensive enough." *Id.* Blair further testified that from her own testing,[2] she did not believe that Thompson was faking or attempting to fake mental illness.

On May 15, 1995, the post-conviction court denied Thompson's claims. The court found that defense counsel had made an adequate investigation into their client's background and prior medical history. The court stated that state post-conviction counsel had presented no proof of mental problems that would have provided Thompson with a defense or shielded him from the death penalty. *Id.* at 580.

---

[2]Blair stated that she administered the following tests:

The tests that I administered in 1992 that directly addressed whether there was psychosis or not, I administered the PAI, I administered the MMPI II which replaces the MMPI which was administered in 1985. I administered the Rorschach, which was not administered in 1985. The PAI was not administered in 1985. I administered the MCMI II and I administered the Rorschach, which is a projective test of personality which was not–the others are all objective. They are all tests in which individual answers true or false and the Rorschach is very different.

*Id.* at 579-80.

The Tennessee Criminal Court of Appeals held that Thompson had failed to establish that any type of psychological impairment in general may have existed which would have been mitigating evidence." *Id.* That court specifically noted that "Dr. Blair declined to give an opinion on these important issues, and the evidence does not preponderate against the trial court's finding that the defense attorneys were not ineffective." *Id.* (quoting *Thompson v. State*, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997)).

## B. Federal Habeas Proceedings

### 1. District Court

On January 23, 1998, Thompson filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (DCTR 1).[3] He also filed a motion and application for appointment of counsel to investigate, prepare and file the petition, pursuant to 21 U.S.C. § 848(q)(4)(B). (DCTR 2). On January 29, 1998, the court granted Thompson's motion for appointment of counsel and designated the Federal Defender Services of Eastern Tennessee, Inc., to provide Thompson with an attorney to prepare and file a petition for a writ of habeas corpus and "to prepare for and participate in all proceedings in connection therewith." (DCTR 3).

On March 9, 1998, the district court held a scheduling conference. Attorney Stephen M. Kissinger was present representing Thompson. Assistant Tennessee Attorney General John H. Baker III was present on behalf of the State. (DCTR 6). On March 11, 1998, the district court entered a scheduling order. The court required, in relevant part, that disclosure of anticipated use of any expert witness and disclosure of information regarding the expert and the expert's expected testimony was to be completed by Thompson by October 30, 1998. The court directed the

---

[3]District Court Record ("DCTR").

Warden to disclose his expert witnesses by December 31, 1998. The scheduling order also provided that the Warden's answer to the petition for writ of habeas corpus was to be filed on or before July 17, 1998, and that the parties file a joint schedule of needed discovery by July 24, 1998.

On May 26, 1998, Assistant Attorney General Glenn R. Pruden became counsel of record for the Warden.

### a. The Petition

As required by the scheduling order, Thompson filed his petition for writ of habeas corpus on June 12, 1998. Thompson alleged in relevant part that his trial counsel were ineffective for failing to: (1) perform a reasonable investigation of his background and mental health history; (2) secure adequate expert assistance regarding his mental health; (3) discover available evidence of mental illness caused by two serious head injuries; and (4) investigate and challenge Thompson's competency to stand trial as well as his competency at the time of the offense.[4] He also

---

[4]In fact, the allegation, as stated in his traverse, reads as follows: The petition alleges in relevant part that:

In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, petitioner was denied the effective assistance of counsel at the guilt phase of trial, the sentencing phase of trial, on appeal, and in post-conviction proceedings. In particular, counsel failed to perform reasonably, and there is a reasonable probability, sufficient to undermine confidence in the outcome of trial, sentencing, appeal, and post-conviction proceedings, that had counsel performed reasonably, petitioner would not have been convicted or sentenced to death, and/or would have received relief on appeal or in post-conviction proceedings. Specifically, counsel was ineffective for the following non-exclusive list of reasons:

a.    Counsel at all critical stages failed to reasonably investigate Mr. Thompson's background and mental health history. Had counsel done so, they would have discovered that Petitioner had, in the years following

his graduation from high school, intermittently demonstrated bizarre and delusional thought patterns, particularly during objectively stressful situations. They would have also discovered that members of Petitioner's family, e.g., his father, had a long and pervasive history of severe mental illness. There is a reasonable probability that such evidence, when coupled with evidence presented during trial, would have convinced one or more jurors that Mr. Thompson's confession was not the truth, but rather the product of the interaction between his mental illness, his desire to protect his co-defendant, Joanne McNamara, and illegal questioning by police, as well as to provide relevant mitigating evidence at the sentencing phase of trial. Trial counsel, however, failed to perform a reasonable investigation, failed to find such evidence, and consequently failed to present the following evidence to the jury, both during the guilt phase and during the sentencing phase of the trial.

b.   Counsel was ineffective for failing to fully investigate and present relevant evidence of Mr. Thompson's mental health history, and to secure adequate expert assistance to defend Mr. Thompson including psychologists, neuropsychological, and/or neurological experts to establish valid mitigating factors including, but not limited to, three statutory mitigating factors under Tennessee law, i.e, that Mr. Thompson suffered from substantial mental disorders and demonstrable physical brain damage which made him unable to conform his behavior to the law; left him under the influence of extreme mental or emotional disturbance, substantially impaired his ability to appreciate the wrongfulness of his conduct at the time of the offense, *and* non-statutory mitigation under both Tennessee and federal law. As importantly, had counsel secured such mental health history, the result of any professionally adequate pre-trial competency and insanity examination (including, if indeed it was, or had been, professionally adequate, the pre-trial competency examination actually performed in Mr. Thompson's case) would have been different. Specifically, but not exclusively:

claimed that he was denied funding for mental health and investigative experts during the state trial and post-conviction proceedings. The petition was signed by Stephen M. Kissinger.

On August 25, 1998, the district court entered an order granting Respondent's motion for extension of time for filing a discovery schedule, moving the deadline to September 2, 1998.

On October 22, 1998, Thompson filed an amended petition for writ of habeas corpus. Thompson contended, in pertinent part, that the state courts denied him funding for mental health and investigative experts at trial and during state post-conviction proceedings, implicating his fundamental rights to due process, equal protection, and effective assistance of counsel. (DCTR 17). Thompson also complained that he was denied expert funding, in violation of his Fifth, Sixth, Eighth

i.    Counsel failed to discover and interview pertinent, available witnesses who could have testified and or informed appropriate mental health experts of Mr. Thompson's descent into intermittent bizarre and delusional behavior following high school;

ii.   Counsel failed to discover available evidence of mental illness caused by two serious head injuries.

iii.  Counsel failed to obtain medical and other important records for the purpose of presenting evidence in mitigation.

c.   Counsel failed to obtain adequate expert assistance, including confidential psychological, neuropsychological, and neurological experts.

d.   Counsel failed to investigate and challenge Petitioner's competency to stand trial as well as his competency at the time of the offense.

and Fourteenth Amendment rights.  He alleged in relevant part:

a.  Both trial and post-conviction counsel knew Petitioner's mental state was an important issue but without assistance from a competent investigator and mental health expert, counsel was unable to explain and overcome the state mental hospital's initial findings.

b.  Attorney Parsons was aware of Petitioner's history of head injuries and "the significant [sic] of those head injuries and what that can do to somebody." P.C. Vol. I, p.38.  Later, counsel also witnessed "a period when he [Petitioner] got sick mentally." P.C. Vol. I, p.83.  Trial counsel requested funds for a mental health expert but were denied.  Instead, Petitioner was sent to Middle Tennessee Mental Health Institute (MTMHI) for a competency evaluation.  Although MTMHI found Petitioner to be competent, Mr. Parsons continued to believe further evaluation was needed.  . . .

c.  Records from Riverbend Maximum Security Institution reflect that several different treating psychiatrists have diagnosed Petitioner as having either a bipolar affective disorder, cyclic mood disorder, schizo-affective disorder or schizophrenia.  All of the psychiatrists described Petitioner's agitated behavior, hostility, inappropriate affect, auditory and visual hallucinations, delusions, paranoia, and thoughts of persecution.  Psychiatrists considered the possibility of Petitioner's malingering and all discounted that possibility.  State examiners at Riverbend ruled out malingering noting that it did not explain all psychotic features.  Test results indicating

schizophrenia were found consistent with Petitioner's psychotic disorder even at his then current "stable" level of functioning.  Since his incarceration, Petitioner has been heavily medicated.  For example, Petitioner has taken Lithium and Klonopin, both indicated for bipolar disorder; Depakene and Depakote indicated for epileptic conditions and rapid cycling bipolar disorder due to brain disease; the anti-psychotic drugs Haldol, Haloperidol, Mellaril, Navane, Thioridazine, and Trilafon; Cogentin/Benztropine to minimize the effect of such drugs; the sedative Vistaril; and, Ativan/Lorazepam and Valium to reduce agitation.

d.  Post-conviction counsel repeatedly requested funds for a mental health expert.  The prosecutor argued that post-conviction counsel were not entitled to experts at state expense.  P.C. Vol. 1, p.16.  In support of the motion for funding, counsel submitted the affidavit of Dr. Gillian Blair.  Dr. Blair's affidavit and post-conviction testimony reflected her need for a complete social history, additional testing and interviews before she could render an opinion on Petitioner's mental status at the time of the crime, at trial, and at the present time.  *See generally* P.C. Vol. I, pp. 199-219.  Dr. Blair opined that based on the Riverbend records, her test results from 1992, and the brief social history available, further investigation and examination of Petitioner was required.  Dr. Blair testified that since 1985 Petitioner had shown a deteriorating mental status.  P.C. Vol. II, p. 209.  Petitioner had been diagnosed with bipolar disorder, schizo affective disorder or schizophrenia.  *Id.*  She further testified that schizophrenia and bipolar disorder, indeed all

forms of psychosis, generally begin in early adulthood, *Id*. at 215, which coincides with the timing of the instant offense. Dr. Blair stated that Petitioner's troubles in the Navy, just prior to the crime, would suggest that he was becoming mentally ill at that time. *Id.* at 216. However, further information was needed to render an opinion and diagnosis of Petitioner at that time. Dr. Blair also stated that further evaluation of Petitioner was necessary to determine his present competency. *Id.* at 207.

e. The court denied funding for expert assistance at the post-conviction hearing. The court reasoned that funds were unnecessary because Petitioner had not shown a "need," further funding would result in a delay of the proceedings and the issue was a matter of record. . . .

f. Although the court found no "need" for further expert assistance, the court later used the fact that Dr. Blair could not express an opinion as to the issues of Petitioner's mental health to limit Dr. Blair's testimony and, subsequently, to deny Petitioner relief from his unconstitutional conviction and sentence. For example, throughout Dr. Blair's testimony, the prosecutor made repeated objections on the basis that Dr. Blair did not have an ultimate opinion. *See e.g.* P.C. Vol. II, pp. 208, 215, 216, 220, 259. Although the court allowed most of Dr. Blair's answers, it did so remarking that the weight of the testimony was specious. *See id.* The court, however, did not allow Dr. Blair to testify about mitigating circumstances.

(Footnotes omitted.).

Thompson further alleged ineffective assistance of counsel, for the following non-exclusive reasons:

1. Counsel at all critical stages failed to reasonably investigate Mr. Thompson's background and mental health history. Had counsel done so, they would have discovered that Petitioner had, in the years following his graduation from high school, intermittently demonstrated bizarre and delusional thought patterns. They would have also discovered that members of Petitioner's family, e.g., his father, had a long pervasive history of severe mental illness. Trial counsel, however, failed to perform a reasonable investigation, failed to find such evidence, and consequently failed to present the following evidence to the jury, both during the guilt phase and during the sentencing phase of the trial.

2. Counsel was ineffective for failing to fully investigate and present relevant evidence of Mr. Thompson's mental health history, and to secure adequate expert assistance to defend Mr. Thompson including psychologists, neuropsychological, and/or neurological experts to establish valid mitigating factors including, but not limited to, three statutory mitigation factors under Tennessee law, i.e., that Mr. Thompson suffered from substantial disorders and demonstrable physical brain damage which made him unable to conform his behavior to the law; left him under the influence of extreme mental or emotional disturbance, substantially impaired his ability to appreciate the wrongfulness of his conduct at the time of the offense, *and* non-statutory mitigation under both Tennessee and federal law. As importantly, had counsel secured such mental

health history, the result of any professionally adequate pre-trial competency and insanity examination (including, if indeed it was, or had been, professionally adequate, the pre-trial competency examination actually performed in Mr. Thompson's case) would have been different. Specifically, but not exclusively:

i. Counsel failed to discover and interview pertinent, available witnesses who could have testified and/or informed appropriate mental health experts of Mr. Thompson's descent into intermittent and delusional behavior following high school.

. . . .

. . . Had counsel been informed, they would have recognized that witness accounts, of Petitioner's bizarre change in behavior signaled the onset of mental illness. The lingering question would have been answered. The outcome of Petitioner's capital conviction and sentence probably would have been different.

(DCTR 17; footnotes omitted). The amended petition for writ of habeas corpus was signed by Stephen M. Kissinger.

### b. Discovery

On November 2, 1998, the magistrate judge held three telephone conferences with Attorney Kissinger and Assistant Attorney General Jennifer Smith regarding Thompson's request for discovery regarding those matters alleged in the petition, to which Respondent objected. The court's order states that, during the hearing, Kissinger advised that he needed to obtain the depositions of three mental health expert personnel who had seen and treated Thompson during his period of incarceration. Respondent maintained his objection

that the allegations before the court did not establish good cause for discovery as required under Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Court. That same day the court entered an order allowing Thompson to take the depositions of Dr. Michael Rutter, Dr. Robert Hoen, and Dr. John Pruett, mental health experts. The order further allowed Respondent the right to take the depositions of Thompson's two experts, neuropsychologist Barry Crown, Ph.D, and psychologist Faye Sultan. (DCTR 18). The magistrate judge noted that the execution of Thompson would violate the Eighth Amendment due to Thompson's incompetence. The order also noted a *Brady* claim.[5]

Also on November 2, 1998, Thompson filed his initial witness list. His "[e]xpert witnesses and testimony" included the following:

---

[5] Although not fully articulated as such, the magistrate judge appears to have based its conclusion on the following allegation in Thompson's amended petition, which the court quoted in its order:

    41. CLAIM 41- BRADY CLAIM

    a. Throughout Petitioner's court proceedings the prosecutor engaged in false and/or misleading questioning and use of reports to argue that Petitioner was competent and not mentally ill. The prosecutor misled Petitioner's judge and jury despite having evidence to the contrary, and without revealing such evidence, thereby committing gross misconduct. For example, during the Petitioner's postconviction proceedings, the state argued that Petitioner was not mentally ill, was competent at the time of trial, was presently competent, and was competent to be executed, despite ten years of records to the contrary. Institutional records clearly illustrate Petitioner's 'significant history of psychosis requiring multiple medications.' Petitioner's mental health treatment plan contemporary to the postconviction hearing reveals a diagnosis of schizophrenia with presenting problems of auditory and visual hallucinations and paranoid ideation. . . .

(DCTR 18).

a.  Dr. Barry Crown, Penthouse Ste 310, Red Road, South Miami, FL 33143, will provide foundation testimony to establish himself as an expert in neuropsychology.  He will testify that he has been provided with background information regarding Petitioner's medical and social history, that he has interviewed, and administered a battery of indicated neuropsycholgical tests to the Petitioner.  He will testify that the results of those tests indicate that Petitioner suffers from organic brain damage.  *He will testify that the brain damage observed, as well as Petitioner's social and medical history, is consistent with schizophrenia. He will testify that Petitioner's brain damage substantially impaired the ability of the Petitioner to distinguish between right and wrong and/or to conform his conduct to the requirements of the law and/or prevented Petitioner from doing the same.*  He will testify that Petitioner's brain damage prevented Petitioner from meaningfully assisting in his own defense at trial and during state post-conviction proceedings and/or from fully comprehending the nature of those proceedings.  He will further testify that arguments regarding Petitioner's mental state made by counsel for the State of Tennessee during state post-conviction proceedings were both outside the scope of a lay person's knowledge and that the prosecutor's statements misrepresented Petitioner's prison medical records.

b.  Dr. Faye Sultan, 8430 University Executive Park Drive, Suite 690, Charlotte, NC 28262, will provide foundation testimony to establish herself as an expert in clinical and forensic psychology.  She will testify that she has been provided with background information regarding Petitioner's medical and social history, that she has interviewed, and administered a battery of indicated psychological tests to the Petitioner.  *She will testify that, on the basis of her examination, it is her expert opinion that Petitioner suffers from schizophrenia and did so at the time of the offense and at the time of trial.  She will testify that Petitioner's mental illness was severe and that it substantially impaired the ability of the Petitioner to distinguish between right and wrong and/or to conform his conduct to the requirements of the law and/or prevented Petitioner from doing the same.*  She will testify that Petitioner's mental illness prevented Petitioner from meaningfully assisting in his own defense at trial and during state post-conviction proceedings and/or from fully comprehending the nature of those proceedings.  She will further testify that arguments regarding Petitioner's mental state made by counsel for the State of Tennessee during state post-conviction proceedings were both outside the scope of a lay person's knowledge and that the prosecutor's statements misrepresented Petitioner's prison medical records.

(DCTR 19) (emphases added).

On November 30, 1998, Respondent appealed the magistrate judge's discovery order.  The district court affirmed the ruling.  Significantly, the district court stated the following:

Additionally, if the facts are developed to show that petitioner's mental health should have been introduced as mitigating evidence, petitioner may be entitled to relief. The magistrate judge heard argument of counsel and then ruled that certain specific discovery would be allowed. . . . Not only has Thompson raised the issue of ineffective assistance of counsel for failure to fully explore his mental health for mitigating purposes at his sentencing, which trial counsel testified he should have explored Thompson's mental health further . . . ; the record also includes factual allegations that there was some mental health evidence that could have been introduced as mitigating evidence.  Furthermore, Thompson alleges he did not receive a full and fair post-

conviction hearing in state court because he was denied funds to hire a mental health expert to prove his incompetency/insanity at trial and at execution. If the fact are fully developed, he may be able to demonstrate he is entitled to relief.

After a cursory review of the numerous volumes of state documents[] involved in this case, it appears that Thompson has alleged a factual basis for some of his claims and the magistrate judge so found. For example, petitioner claims trial counsel failed to properly investigate his mental health history and present mitigating evidence at trial and sentencing. Petitioner contends he had two serious head injuries and intermittent bizarre and delusional thought patterns and witnesses to testify to such, and this mitigating evidence should have been introduced. Furthermore, petitioner contends that his institutional records reveal a diagnosis of schizophrenia with problems of auditory and visual hallucinations and paranoid ideation. If petitioner proves these factual allegations, he may be entitled to relief.

(Footnote omitted) (DCTR 22).

On December 24, 1998, Respondent filed his initial expert witness list disclosure. It listed simply Dr. Theodore H. Blau, who would "testify as an expert in the area of forensic neuropsychology. Dr. Blau will be called, if necessary, to rebut the testimony of petitioner's expert witnesses, Dr. Barry Crown and Dr. Faye Sultan, as disclosed in petitioner's initial witness list of October 30, 1998." (DCTR 24).

On December 29, 1998, Attorney Kissinger moved to appear *pro hac vice*. (DCTR 25).

On February 3, 1999, the district court granted Thompson's request for an extension of time to conduct discovery. The court set the discovery date at June 11, 1999, and the dispositive motion cutoff at July 2, 1999. (DCTR 32).

On February 12, 1999, Thompson filed an *ex parte* motion for a temporary mandatory restraining order, for preliminary and permanent injunctive relief, and for an order finding Thompson incompetent to proceed, continuance, and to toll. (DCTR 34). In support, Thompson alleged in part as follows:

1. Petitioner suffers from schizophrenia. During the vast majority of his incarceration Respondent has medicated Petitioner in order to treat his mental illness.

2. On or about September 1998, Respondent stopped providing Petitioner with appropriate psychiatric medication.

3. Petitioner's mental health thereafter radically declined. Petitioner is now unable to meaningfully assist counsel or understand the nature of the proceedings in which he is being required to participate. Moreover, because of the severe nature of Petitioner's mental illness, Respondent's refusal to provide appropriate psychiatric care is tantamount to subjecting Petitioner to physical torture. *See*, Exhibit A, Declaration of Faye Sultan PhD. attached.

. . . .

6. Petitioner has no remedy at law. . . . Given the Petitioner's incontrovertible right both to receive proper psychiatric care and to seek federal habeas corpus relief the likelihood that he will prevail on the merits of his motion are great. Should Respondent be allowed to continue to deprive Petitioner of proper psychiatric care Petitioner will suffer irreparable injury. Not only is he being rendered incompetent, he is, for all intents and purposes, being tortured.

(Footnotes omitted.). The motion was signed by Attorney Kissinger (by permission). (DCTR 34).

Attached to the February 1999 motion is the declaration of Faye Sultan, Ph.D, a clinical psychologist. Sultan stated in relevant part that

At the request of attorneys at the Federal Defender Services of Eastern Tennessee, I initiated a psychological evaluation of Mr. Gregory Thompson in August, 1998. Formal psychological testing and extensive clinical interview were conducted with Mr. Thompson at the Riverbend Maximum Security Prison in Nashville, Tennessee on 8-20-98. This interview was conducted as a "Contact Visit", with no physical barrier between this examiner and Mr. Thompson, and Mr. Thompson was not physically restrained in any way.

In addition to the data gathered during this examination, I was asked to review extensive documentation about Mr. Thompson's psychiatric, military, and legal history. These data also serve as bases for the opinions rendered here. These data include psychiatric records and examinations regarding Mr. Thompson for approximately the past fifteen years, administrative and medical records from the Tennessee Department of Corrections, and legal and police documents relating to the original offenses for which Mr. Thompson is currently incarcerated. In total, hundreds of pages of records and documents have been reviewed for the purpose of this evaluation.

(DCTR 34). Dr. Sultan also stated that in August 1998 Thompson met all of the diagnostic criteria for the major mental illness schizophrenia, episodic, with interepisode residual symptoms. She further indicated that Thompson's condition had rapidly deteriorated between August 1998 and February 1999. In Dr. Sultan's opinion, Thompson was experiencing a severe psychiatric crisis, making him unaware

of his surroundings, and requiring immediate emergency attention. (*Id*).

On April 7, 1999, Thompson moved to withdraw his *ex parte* motion for injunctive relief and for an order finding him incompetent to proceed, principally because on April 6, 1999, Dr. Sultan saw Thompson and concluded that his condition had improved, due to an adjustment in his medication. Thus, the factual basis for the motion no longer existed. (DCTR 64). On April 29, 1999, the court granted the motion to withdraw the ex parte motion. (DCTR 67).

On June 28, 1999, the district court entered an order extending the discovery deadline to July 30, 1999. The court extended the deadline to allow Respondent to depose Thompson's expert witnesses, Drs. Crown and Sultan, and to allow Petitioner to depose Respondent's expert witness, Dr. Theodore Blau. On July 9, 1999, Respondent filed a motion for summary judgment as to all claims raised in the amended petition for writ of habeas corpus. (DCTR 81-82). On July 15, 1999, Thompson deposed Respondent's expert, Dr. Blau. On July 20, 1999, Respondent deposed Petitioner's expert. Dr. Crown.[6] On July 29, 1999, Thompson filed his response to Respondent's motion for summary judgment.

On August 2, 1999, Respondent filed a motion for reimbursement of deposition expenses. (DCTR 87). Respondent claimed that Dr. Crown's deposition testimony was considerably different than that represented in Petitioner's initial witness list. Specifically, Respondent alleged that, based on Petitioner's initial disclosure concerning Dr. Crown's testimony, particularly as to Petitioner's mental state at the time of the offense, "*i.e.*, his ability to distinguish between right and wrong and/or to conform his conduct to the requirements of law, competency

---

[6]As will be explained shortly, counsel for Respondent deposed Thompson's other named expert, Dr. Faye Sultan, PhD. on July 22, 1999.

at the time of trial," counsel for Respondent traveled to Miami, Florida to depose Dr. Crown. Respondent further claimed that, at the beginning of the deposition, he was presented "for the first time" with an affidavit indicating Dr. Crown's proposed testimony, which was significantly different from the October 30, 1998, initial witness list disclosure. The affidavit indicated no opinion as to Thompson's mental state at the time of the offense or at trial, no opinion indicating that brain damage substantially impaired Thompson's ability to conform his conduct to the requirements of law and/or to distinguish between right and wrong, and no opinion concerning Thompson's ability to assist counsel in his defense at trial or comprehend the nature of that proceeding.

Respondent alleged that, "contrary to representations in Petitioner's initial expert disclosure, Dr. Crown testified in his deposition that he had not rendered, nor had he been asked to render, an opinion concerning Petitioner's mental status at the time of the offense in this case." (DCTR 87). The motion stated that Dr. Crown testified that he was also not asked to render an opinion concerning Petitioner's competence at the time of trial. The motion further alleged that "Dr. Crown testified that he had seen petitioner on one occasion, June 12, 1998, and was prepared to render an opinion concerning petitioner's competence and mental status on *that* day." Thus, in Respondent's view, "Dr. Crown offered no testimony pertinent to any claim presented in the amended petition for writ of habeas corpus." Respondent therefore claimed that, had he been advised of the precise nature of Dr. Crown's testimony, as required under Fed. R. Civ. P. 26(a)(2)(B) and by the district court's order of March 11, 1998, he likely would not have deposed Dr. Crown. Respondent contended that, given the clear representations in his October 1998 expert disclosure statement, Petitioner had a duty to disclose the nature of Dr. Crown's testimony. Respondent sought an order requiring Petitioner to reimburse Respondent in the amount of $2,768.71 for expenses incurred

in connection with the July 20, 1999, deposition of Dr. Crown.

On August 4, 1999, Petitioner filed a motion in limine, seeking to exclude Dr. Blau's testimony on the grounds that Dr. Blau neither formed an opinion nor was asked to form an opinion regarding any of the issues raised in the petition: "Despite all issues being clearly framed by the allegations in the petition, Respondent never sought, nor did Dr. Blau render, any opinion contrary to such allegations." (Footnote omitted.). (DCTR 88). Also on August 4, Petitioner filed a motion for costs incurred in deposing Dr. Blau. Petitioner alleged in pertinent part:

2.   On July 15, 1999, undersigned counsel conducted the deposition of Dr. Blau in order to discover the substance of his testimony at the evidentiary hearing. At that time Dr. Blau testified that he had been asked to render an opinion only in regard to Mr. Thompson's competency to proceed in the instant action . . . ; that he had not reached any opinion other than that reflected in his report on the competency to proceed . . . ; and that in order to render additional opinions he would require further interviewing and testing of Mr. Thompson. . . .

3.   It is clear that although Respondent was on notice of Petitioner's mental health claims which are detailed in his habeas petition and was on notice regarding Petitioner's anticipated expert's testimony, Respondent either instructed Dr. Blau not to render any opinion during deposition regarding the issues in the petition or Dr. Blau failed to formulate such opinions. *It appears that Respondent made the strategic decision to limit Dr. Blau's testimony to Mr. Thompson's competency to proceed given Dr. Blau's sworn testimony that his opinion was limited to Mr. Thompson's competence to proceed, the fact that Dr. Blau only evaluated Mr. Thompson on one occasion for the specific purpose of competency to proceed, and that Respondent did not*

*provide a copy of Petitioner's habeas petition to Dr. Blau.*

4.   Undersigned counsel relied upon Respondent's representation that Dr. Blau would rebut Petitioner's expert witnesses.   Had undersigned known that Dr. Blau's opinion was limited to Mr. Thompson's competency to proceed, an issue which is no longer before this court, he would not have taken Dr. Blau's deposition and incurred expenses totaling $4,097.01.

(DCTR 89) (emphasis added) (footnote omitted).  Petitioner requested a court order requiring Respondent to pay those costs.   The motion for costs is signed by Stephen M. Kissinger.

On August 5, 1999, Thompson filed a response opposing Respondent's motion for reimbursement of deposition expenses.   In it he contended that the opinions Dr. Crown expressed in his deposition were materially consistent with Thompson's initial witness list.  In response to Respondent's contention that Dr. Crown failed to provide an opinion at deposition regarding Thompson's mental condition at the time of the offense, Thompson stated that "[t]his allegation is untrue or irrelevant for at least two reasons."  First,

5.   Insofar as Respondent's complaint relates to Dr. Crown's response to the Assistant Attorney General Pruden's very few questions which Respondent elected to attach to his motion, Dr. Crown was not asked whether he had an opinion regarding Petitioner's mental condition at the time of the offense *or* at trial.  Instead Mr. Pruden chose to focus on the communication between Dr. Crown and Respondent's counsel.[7]

---

[7]6.  Respondent posed the following questions:

Have you been asked to render any determination about whether he was competent to stand trial at his criminal

. . . .

7.   Not one of these questions asked whether Dr. Crown had an opinion on the issue of mental state at the time of the offense, at trial, or at any other time for that matter. They queried only regarding the communications between Dr. Crown and undersigned counsel.  As a matter of fact, only once in the excerpts attached to Respondent's motion does Mr. Pruden ask any question which could reasonably be interpreted as seeking Dr. Crown's opinions on these issues.

---

trial?

(Crown deposition at Page 7, lines 11-13)

So if I understand you correctly, you were only asked [by Respondent's counsel] to make a competency determination at the time you met Mr. Thompson?

(*Id.* at Page 7, lines 19-21)

Have you been asked to render any opinions concerning Mr. Thompson's mental status at the time of the murder of Brenda Lane?

(*Id.* at Page 8, lines 7-9)

Not specifically.  Does that mean that you have not been asked that specific question?

(*Id.* at Page 8, lines 11-12[)]

So you have not been asked to render an opinion to Mr. Kissinger yet one way or the other regarding Mr. Thompson's ability to distinguish between right and wrong or conform his conduct to the requirements of the law at the time of Ms. Lane's murder?

(*Id.* at 17-20).

8. On that occasion, Dr. Crown responded that he was unable to render such an opinion because he could not be certain whether he had been provided all relevant information. Crown deposition at Page 9, lines 4-15. Rather than show that he had no opinion on a material issue, Dr. Crown's answer demonstrated that he would not carelessly issue an opinion until counsel for Respondent defined the facts upon which counsel wished Dr. Crown to base that opinion. Despite Dr. Crown's qualified response, counsel for Respondent never asked Dr. Crown whether, *assuming that Dr. Crown had all relevant information*, he had an opinion regarding Mr. Thompson's mental state at the time of the offense and/or at trial, nor did counsel provide Dr. Crown with supplemental fact which Respondent deemed relevant and then ask him whether, based upon the combined information, he held an opinion on those regards.

9. The reasons Respondent failed to discover Dr. Crown's opinions in these areas were not because Dr. Crown held no such opinions. Respondent's counsel either made a strategic decision to focus on the conduct of counsel (or perhaps to attempt to create the *illusion* that Dr. Crown's opinions regarding these areas will come as a complete surprise to the Respondent when they are stated at hearing), *or* he simply neglected to ask the relevant questions.

(DCTR 90).

Thompson articulated a second reason, namely that Dr. Crown's deposition did substantially conform to the information contained in his initial witness list because Crown stated during his deposition "that Petitioner suffers from bipolar disorder of a schizo-affective type *and* that the onset of this affliction was prior to the alleged offense. Crown deposition at Pages 32-34, *in passim*." Thompson added that "[u]nless Respondent can seriously maintain that it is *material* in this case whether Dr. Crown found that Petitioner suffered

from one severe schizotypal mental illness *at the time of the offense as well as his state court trial* rather than another severe schizotypal mental illness, Dr. Crown's deposition testimony is clearly consistent with the information contained in Petitioner's Initial Witness List." Thompson also alleged that Respondent was not in a position to complain that Dr. Crown's testimony did not make the connection between Petitioner's mental illness and competency at the time of the offense, because Respondent "with full knowledge that Dr. Crown was of the opinion that Petitioner was severely mentally ill at the time of the offense, either chose not to inquire regarding the afore-described connection or *forgot to do so.*" (DCTR 90) (emphasis added). Thompson therefore claimed that he had demonstrated that the information in his initial witness list was consistent with Dr. Crown's testimony. He further claimed that even if it was materially inconsistent, Respondent could not complain because he had previously made this allegation to the magistrate judge, who granted Respondent the right to depose both Drs. Crown and Sultan before Respondent ever contacted Dr. Blau. Thus, Thompson claimed that Respondent had been granted the opportunity to determine the exact opinions of Dr. Crown before Dr. Blau was ever contacted. (DCTR 90).

Next, Thompson asserted that Dr. Blau stated during his deposition that he was contacted by Respondent's counsel, Pruden, on November 2, 1998, to retain him as a psychological expert and that he was asked simply "to review records in respect to competence to proceed regarding Mr. Thompson, and possible questions were whether Mr. Thompson is competent to act as a party participant in habeas corpus proceedings," and also whether he "could determine psychologically his mental condition and status with respect to his capacity to understand his legal position and his options." (DCTR 90 (quoting Deposition of Theodore H. Blau, Ph.D., July 15, 1999, Page 5, lines 8-19). Thompson further alleged that Dr. Blau was asked whether he had been asked to examine Thompson regarding any area other than competency and that "[h]is response clearly demonstrated that

not only had he not examined and/or reached any opinions in any area other than Petitioner's present competency, the only neuropsychological examination he had conducted was 'at best' . . . a screening examination." (DCTR 90 ¶ 6). Thompson therefore moved for an order denying Respondent's motion for reimbursement of deposition expenses. (DCTR 90).

In his reply, Respondent stated simply that the documents attached to its motion for reimbursement plainly demonstrated that Thompson's October 1998 disclosure was materially different from the testimony offered at Dr. Crown's deposition and in his affidavit. (DCTR 91). Attached as an exhibit was a complete copy of Dr. Crown's July 20, 1999, deposition. Much of it bears repeating here:

Q: Specifically, what issues regarding Mr. Thompson and his case have you been asked to review and render expert opinions on, sir?

A: At this point, I have been asked to consider his competency and also his mental status.

Q: Okay. Let's take them one at a time, then. Competency, are you talking strictly about his present competency in the habeas corpus proceedings?

A: I am talking about his competency at the time that I saw him.

Q: Have you been asked to render any determination about whether or not he was competent to stand trial at his criminal trial?

A: No.

Q: Has anything been said to you that would lead you to believe that you might be asked at a

future date prior to the evidentiary hearing to render such an opinion?

A: It hasn't been suggested or asked of me.

Q: So if I understand you correctly then, you were only asked to make a competency determination at the time you met Mr. Thompson?

A: That is correct.

Q: And when was that, sir?

A: June 12th of 1998.

Q: All right. *His mental status. Please elaborate for me, what about his mental status have you been asked to opine?*

A: *I have been asked to evaluate it.*

Q: His mental status at present?

A: Well, it was his status as of the time that I saw him. I haven't seen him since June 12th of 1998.

Q: *Have you been asked to render any opinions concerning Mr. Thompson's mental status at the time of the murder of Brenda Lane?*

A: *Not specifically, no.*

Q: *Not specifically. Does that mean that you have not been asked that specific question?*

A: *That is correct.*

Q: *Have you rendered an opinion, though, in that regard?*

Q: *No, not as of this time.*

Q: *So you have not rendered an opinion to Mr. Kissinger yet one way or another regarding Mr. Thompson's ability to distinguish between right and wrong or conform his conduct to the requirements of the law at the time of Ms. Lane's murder?*

A: *That is correct.*

Q: *Has Mr. Kissinger, or anyone else representing Mr. Thompson, represented to you that they would like you to render such an opinion during the course of your employment?*

A: *No.*

Q: Just so I am clear then, your mental status evaluation of Mr. Thompson is only to evaluate his mental status at present?

A: I have only seen him on one occasion, June 12th of 1998. So what I have to say would be related to that examination. I have looked at other records, but I don't know they are necessarily complete, and I couldn't render an opinion based on the lack of completeness, or what I assume is the lack of completeness.

Q: So you don't feel that based on the materials that you have reviewed to date that you could, based on your professional experience, render an opinion about Mr. Thompson's mental state say back in 1985 at the time of the murder?

A: As I sit here today, I could not.

Q: So you are not prepared to render any opinion in that regard today?

A: That is correct.

Q: What materials have you been provided to review concerning Mr. Thompson?

A: I have seen what I believe to be his Department of Corrections file from it's [sic] inception.

Q: And when you say his Department of Corrections file, do you mean his medical/mental health file?

A: It's his medical file, as well as his general file, including disciplinary reports, including adjustment reports.

Q: Have you reviewed any other records?

A: I have seen the depositions of three of the employees of Prison Health Services. I have seen the reports of the mental health facility that Mr. Thompson spent thirty days in prior to his original trial. I have seen the testimony of the mental health professions at his trial, Dr. Kogley.

Q: Cobley?

A: Cobley. I have seen the materials from Dr. Blaire.

Q: How about Dr. Watson?

A: Watson. I have seen Dr. Watson.

Q: When you say materials from Dr. Blaire, does that simply mean her testimony, or have you seen other--

A: I have seen the raw data, or parts of raw data. Actually, the entire raw data are not in the materials that were provided to me. And then I have seen Dr. Blau's report and Dr. Blau's raw data.

Q: And you just received Dr. Blau's--

A: Correct.

(DCTR 91).

Dr. Crown also indicated that he had reviewed Thompson's medication portfolio from his records at Riverbend Maximum Security Institution. When asked, Dr. Crown stated that he had not read, and not been asked to read, the trial transcript, but that he had asked Mr. Kissinger "to provide me with whatever materials he wished." (DCTR 91). Dr. Crown acknowledged that he had not given Kissinger a specified list of items he wished to review, but was "relying on whatever it is Mr. Kissinger" gave him.

Dr. Crown also stated that he met with Thompson on June 12, 1998, at Riverbend for about two and one half hours. Dr. Crown indicated that, at that time, he took a brief history, a standard basic demographic clinical interview, and administered a group of tests.[8] Dr. Crown testified that the only written record of his evaluation was his July 20 affidavit; that he would only prepare a written report if Kissinger asked.

---

[8] Dr. Crown stated that he administered the following tests: The Shipley Institute of Living Scale; the G-F-W Auditory Selective Attention Test; the Category Test; the Kaufman Neuropsychological Assessment Procedure; the Luria Memory Test; the Reitan-Indiana Aphasia Screening Test; the Rey-Osterreith Complex Figure Test; the Trailmaking Test; Word Generation, F/A/S; Finger Oscillation Test; and the Wisconsin Card Sorting Test.

He also indicated that Kissinger had not at that time asked him to do so.

Dr. Crown opined that Thompson suffers from an auditory processing deficit. He further indicated that Thompson has some sort of organic brain damage, but that he did not pinpoint it to a specific portion of the brain. Dr. Crown stated that he did not intend to make any further evaluation of Thompson's organic brain damage unless asked. Dr. Crown indicated that he knew that Thompson had suffered traumatic head injuries. He testified that he had not seen Thompson's military medical records. Dr. Crown testified that the organicity was secondary to other mental impairments, namely schizo-affective disorder, bipolar subtype, with organic components. Dr. Crown stated that he reached this conclusion

from looking at the reports of the treating physician, the psychiatrists, and psychiatric nurses, and nurse practitioners that have had the opportunity to monitor him over the last fourteen years, that I have concluded that he's best treated with anti-psychotic medication, that schizo-affective disorder is a disorder that affects thoughts related to reality and results in distortions of reality.

It also results in distortions of affect, meaning, the way that behavior is expressed. And I believe that his affect has been variable from rather depressed to highly agitated and aggressive. And so, putting that together, I believe he does have a schizo-affective disorder of the bipolar type, meaning, there is a considerable spread in his emotionalities, that there is a distortion in his perception of reality, that he tends to fragment at times, and tends to be directed by hallucinatory activity.

. . . [I]n Mr. Thompson's case, there are notations throughout his medical records that he has auditory hallucinations. He also related to me that at the time I

saw him he was auditory hallucination free, but that he frequently got command hallucinations that there were voices coming from within him that were telling him what to do, which is what happens in an auditory hallucination state.

(DCTR 91). The following colloquy between counsel for Respondent and Dr. Crown, then took place:

Q: Based on your review of Mr. Thompson's records or the records that were provided to you, what do you conclude, or when did you conclude, was the onset of these auditory hallucinations?

A: *I have no real pinpoint. For that, most typically, people with schizo-affective disorder tends to develop in late adolescence to early adulthood.*

Q: From the materials you have reviewed, do you see anything in those materials that show that this is when it occurred in Mr. Thompson?

A: *I believe he began to have a more difficult time with life in his–in the last stages of his military service. So I believe that the beginnings of it would be tracked to that. I haven't seen the records, but I believe that that's probably when I would anticipate that it would have begun.*

(Emphases added.)

Counsel for Respondent also asked Dr. Crown whether he had talked with any of Thompson's family members to gain insight into his background while growing up. Dr. Crown stated that he had not, nor had he spoken with school teachers, counselors, or ministers. Dr. Crown also indicated that he had not spoken with Joanne McNamara, or Arlene Cajulao.

Next, counsel asked Dr. Crown:

Q: And if I understood your answers earlier correctly, you do not have an opinion at this time as to the exact nature of this brain damage for which you have seen some indicia?

. . . .

A: I don't specifically know the causation. I believe it may be secondary to his thought disorder since we know that in people who do have chronic thought disorders that the thought disorder itself may either be caused by or may result in some damage to the brain. For example, schizophrenics very often have enlarged ventricles of the brain.

Q: I notice that you did not attempt to administer an MMPI to Mr. Thompson. The reason for that, sir?

A: In the regular course of my neuropsychological evaluations, I tend not to administer a personality questionnaire. I leave that for, or the assessment of personality, specifically to a clinical psychologist or a psychiatrist.

Q: In this case, this would be something that you would defer basically to Dr. Sultan?

A: I would defer in terms of administering or interpreting of the personality testing. Yes.

Q: Would an MMPI-2 be useful in terms of assessing organic brain damage?

A: No, not necessarily. No.

. . . .

A: No. If I thought it was necessary to form a neuropsychological opinion, I would have given it.

Q: And in this case you didn't?

A: That is correct.

Q: And part of that is because you are not interested in determining whether or not he can distinguish between right and wrong?

A: I was asked to assess his neuropsychological status, and that to [sic] extent, I wasn't asked to consider issues of determining right or wrong, sanity, and I wasn't asked specifically to consider personality. But when I looked at him, it was clear to me that Mr. Thompson also had personality problems. He had a thought disturbance.

I assumed that someone else would be looking at him in terms of those thought disturbances, the personality difficulties, *and I just recently learned that Dr. Sultan had looked at him.*

(Emphasis added.) Dr. Crown stated that he had worked with Dr. Sultan on several capital cases.

Counsel for Respondent recapped:

Q: My understanding then is you were solely asked to talk about Mr. Thompson's current competency. That's what you have been asked to render an opinion about–or competency at the time you saw him?

A: Competency and mental status.

Q: In terms of competency, did you evaluate him as being competent?

A: At the time that I saw him, it's my opinion he was competent.

(DCTR 91).

In response to Thompson's motion for costs, Respondent reiterated that in his October 30, 1998, initial witness list, Thompson stated that he intended to call two expert witnesses, Dr. Barry Crown and Dr. Faye Sultan. Respondent stated that with regard to the substance of the expert testimony, Petitioner indicated that each would testify in pertinent part that Petitioner's mental condition substantially impaired his ability to distinguish between right and wrong and/or to conform his conduct to the requirements of law. Respondent contended that on December 24, 1998, Respondent notified Petitioner that he intended to call Dr. Theodore Blau as an expert in the area of forensic neuropsychology to rebut the testimony of Drs. Crown and Sultan. Respondent further claimed that, pursuant to the November 2, 1998 order of the magistrate judge, Respondent conducted the depositions of Dr. Crown and Dr. Sultan on July 20, 1999, and July 22, 1999, respectively.[9] Respondent further contended that, prior to those depositions, Respondent received no information from Petitioner other than that contained in the initial witness list, nor had Respondent been provided with any information concerning the data or other information considered by the witnesses in forming their opinions, as required by Fed. R. Civ. P. 26(a)(2)(B). Finally, Respondent asserted that, although it was clear from Respondent's notice of expert witnesses that Dr. Blau would be called to rebut the testimony of Petitioner's experts, Petitioner chose to schedule the deposition of Dr. Blau on

---

[9] Kissinger defended both depositions.

July 15, 1999, before the previously-scheduled depositions of Drs. Crown and Sultan.

### c. The District Court's Ruling on the Rule 56 Motion

On February 17, 2000, the district court issued a Memorandum granting Respondent's summary judgment motion as to all claims and dismissing his § 2254 motion. The district court stated in relevant part:

*Petitioner claims experts recently obtained by him have revealed that he was incompetent under Tennessee law at the time of the crime and throughout his court proceedings. Petitioner has failed to state the name of the expert and failed to provide the proof of these revelations. The Court has read the deposition of Dr. Crown, (Court File No. 119, Exhibit 1) but was unable to located [sic] his opinion that Thompson was incompetent at the time of the crime and throughout his court proceedings. As a matter of fact, Dr. Crown stated he was not asked to render any determination about whether or not Thompson was competent during his state jury trial. (Court File No. 91, Exhibit 1, pp. 7-9). Dr. Crown stated he was only asked to make a competency determination at the time he met Mr. Thompson on June 12, 1998.* After meeting with Thompson for two and a half to three hours, which consisted of taking a brief history for twenty-five to thirty minutes and the remainder of the time was spent administering tests, it was his opinion that Thompson was competent on June 12, 1998. (Court File No. 91, Exhibit 1, p. 7-47).

Dr. Crown did testify Thompson had a significant auditory processing deficit which means he is easily distracted by external auditory stimuli. (Court File No. 91, Exhibit 1, p. 20). He further testified that some of the test results led him to conclude that there was some sort of organic brain damage. However, he is not able to make any assessment of the severity of the damage nor

does he intend to make such an evaluation. (Court File No. 91, Exhibit 1, pp. 24-28). Dr. Crown believes this organicity is secondary to a thought disorder which he refers to as a schizo-affective disorder-bipolar subtype with organic components. Dr. Crown bases his conclusion on the reports of the people who have treated Thompson for the last fourteen years. (Court File 91, Exhibit 1, p. 35).

Respondent hired Dr. Blau to rebut Dr. Crown's testimony. Portions of Dr. Blau's testimony have been filed with the Court. Dr. Blau testified he did not observe or see any indications of organic brain damage on the test he administered. Dr. Blau found Thompson's responses during testing were rational and appropriate. (Court File No. 89, Attachment C, pp. 31, 47-48).

*Thompson has failed to provide any significant probative evidence which would make it necessary for this Court to resolve a factual dispute. . . . Thompson has not provided this Court with anything other than factually unsupported allegations that he was incompetent at the time he committed the crime and at the time of his jury trial. Nor has Thompson provided this Court with any significant probative evidence that Thompson was suffering from a significant mental disease that should have been presented to the jury during the punishment phase as mitigation evidence.*

*Petitioner had two different psychological evaluations and both resulted in findings of competency at the time of the crime and at the time of trial. Additionally, the record shows that trial counsel did reasonably investigate Thompson's background and mental health history.*

Memorandum dated February 17, 2000 at 53-55 (emphases added) (DCTR 124).

#### d. The Motion to Alter or Amend

On March 2, 2000, Petitioner filed a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59. By way of introduction, the motion states:

As an initial point, undersigned counsel apologizes for any lack of clarity which may exist in Petitioner's pleadings.1 Though counsel disagrees with the Court's criticism of those pleadings, the fact that the Court's Decision is contrary to controlling authority and sound legal reasoning provides empirical evidence that undersigned counsel has somehow failed to bring that authority and reasoning to the Court's attention. Mr. Thompson should not suffer because of counsel's shortcomings. Furthermore, this Court should not face almost certain reversal simply because counsel phrased otherwise irrefutable arguments in such a way that the Court remained unaware of the proper resolution of Respondent's Motion for Summary Judgment. In an effort to fulfill his duty to both his client and the Court, counsel now attempts to phrase those arguments in such a way that the Court is fully aware of their nature and asks this Court to alter or amend the judgment entered herein to fully address such arguments and thereafter deny Respondent's Motion for Summary Judgement.2

--------

1The Court's Decision contains several negative comments regarding perceived deficiencies in undersigned counsel's pleadings.

2Though Mr. Thompson does not waive or concede any of the issues and/or arguments raised by the pleadings which were not expressly or previously waived or conceded, and the same are reasserted herein, Petitioner's Motion to Alter or Amend centers on two primary issues: (1) whether the procedural bar which

was, *or would be*, applied to claims arising from facts not heretofore presented to the state courts of Tennessee is independent of federal law; and (2) whether the State of Tennessee's interference with Mr. Thompson's attempts to present claims arising from his *unquestionably* severe mental illness *either* deprived Mr. Thompson of a full and fair opportunity to present the facts supporting those claims to the state courts of Tennessee *or* provided "cause" for not presenting the facts supporting those claims to the state courts of Tennessee.

(DCTR 126, at 1-2). Thompson then presented argument on two issues, namely, that "The Tennessee Courts Will Not Apply the Tennessee State Post-Conviction Statute of Limitations to Petitioner's 'Later-arising' Claims in a Manner that is Independent of Federal Law, " and that "The Tennessee Court's Refusal To Afford Petitioner Mental Health Services During State Post-conviction Proceedings Constituted a State Obstacle to the Presentation of Facts And/Or Claims Arising From Mr. Thompson's Mental Illness." In conclusion, Thompson reiterated that although the motion to alter or amend did not specifically address every error in the district court's decision, which he specifically reasserted, "[t]he errors addressed herein, however, go to the very integrity of the judicial process." (DCTR 126 at 10). The motion was signed by Stephen M. Kissinger.

#### e. The District Court's Ruling on the Motion to Amend

On March 31, 2000, the district court denied the motion, holding that Thompson had failed to present any additional information which justified reconsideration and an order altering or amending judgment. (DCTR 128).

On April 21, 2000, Thompson filed his notice of appeal to this Court.

### f. The Rule 60(b) Motion

On March 2, 2001, Thompson, through undersigned appellate habeas counsel, Dana C. Hansen, also of the Federal Defenders Office of Eastern Tennessee, filed a motion under Fed. R. Civ. P. 60(b).[10] In that motion, Thompson "respectfully request[ed] the Court to relieve Mr. Thompson from the final order entered on February 17, 2000, for the purpose of entering an order to supplement the record with Respondent's deposition of Dr. Faye E. Sultan, Ph.D, and the accompanying report of Dr. Sultan." (DCTR 133, at 1). Thompson claimed that the petition was timely. "The order entered in Mr. Thompson's case granting summary dismissal of his amended petition for writ of habeas corpus was entered on February 17, 2000. Therefore this motion, being filed within one year of the order, is timely." (*Id.*)

Thompson explained "Dr. Sultan's Involvement in this Case:"

Earlier in Mr. Thompson's District Court proceedings, Respondent took the deposition of Dr. Sultan. The district court record presently contains a summary of her conclusions in an expert disclosures pleading (R. 19) and an affidavit detailing her opinion regarding Mr. Thompson's mental health status in February 1999 (R. 34). Having examined Mr. Thompson and viewed his social and medical history, Dr. Sultan executed a report in addition to her testimony at Respondent's deposition. (Attachments A & B).

Although this Court denied Mr. Thompson's mental health related claims partially on procedural grounds, Dr. Sultan's deposition and report are important to the merits

of the claims. With regards to the merits of Mr. Thompson's mental health related claims, he maintains that he made a sufficient showing of a genuine issue of material fact to overcome Respondent's summary judgment motion notwithstanding Dr. Sultan's opinions. However, Dr. Sultan's opinions certainly are directly relevant to the mental health related claims and should be considered by the Court. *Counsel for Mr. Thompson engaged in* [sic] *Dr. Sultan's services for the sole purpose of offering her opinions to support his constitutional claims.* The failure of counsel to ensure that Dr. Sultan's opinions were filed in the record is a result of excusable neglect.

(*Id.* at 2) (emphasis added).

In support of his claim that Dr. Sultan's deposition and report were not included in the record because of mistake, inadvertence, surprise, or excusable neglect, Thompson stated the following:

District Court counsel for Mr. Thompson, Stephen M. Kissinger, was under the mistaken belief that the evidence was in the record.1 To the extent that counsel should have nonetheless known that Respondent had not placed Dr. Sultan's deposition and report in the record, counsel's failure to ascertain that fact and file the same himself was the result of excusable neglect. During the time period in question, counsel's office was in a state of turmoil and his caseload was excessively burdensome.

---

[10]On March 2, 2001, Hansen filed with this Court a motion to hold case in abeyance pending Thompson's contemporaneous Rule 60(b) motion in the district court. Dr. Sultan's deposition is attached to that motion. We denied that request by order dated March 21, 2001.

As described fully in the attached affidavit of counsel, Stephen M. Kissinger, this state of disorder contributed to counsel's excusably negligent failure to realize that Dr. Sultan's deposition and report were not filed in the record. (Attachment C).

_____

1. Respondent's deposition of Dr. Crown and the accompanying report were placed in the record by Respondent. (R. 91). Because Respondent had moved for costs incurred in, *inter alia*, hiring its own mental health expert, Dr. Blau, on the grounds that Dr. Blau's services were unnecessary because Petitioner had no expert opinions to support the mental health related allegations contained in the petition*, counsel for Mr. Thompson was under the mistaken belief that Respondent had placed his deposition of Dr. Sultan and the report which Dr. Sultan had supplied to Respondent in the record.*

(*Id.* at 3) (emphasis added). Thompson therefore asked the Court to order the record supplemented with the deposition and report of Dr. Faye E. Sultan, PhD, and that the district court revisit its previous summary denial of Thompson's petition. (*Id.*)

### (i). Dr. Sultan's Report

Attached to the motion are three exhibits. The first is a psychological report prepared by Dr. Sultan, dated July 22, 1999. Dr. Sultan states the referral questions as follows:

1. Mr. Thompson's current psychological status[.]

2. *Mr. Thompson's likely psychological status and mental state before and surrounding the time of the 1985 offense.*

3. Social, environmental, psychological, and economic factors in the life of Mr. Thompson which might have [to] be considered to be mitigating in nature at the time of his trial.

(DCTR 133, Attachment A; emphasis added).

Dr. Sultan's report indicated that she began psychological evaluation of Thompson on August 20, 1998. At the first session, which lasted four hours, Dr. Sultan conducted a clinical interview and administered the MMPI-2. Dr. Sultan also noted that she did not assess Thompson's levels of current intellectual and neuropsychological functioning because they had recently been assessed by Dr. Crown.

Thereafter, Dr. Sultan initiated "a very extensive review of legal, military, medical, prison and psychiatric/psychological records." Regarding "Relevant Psychological/Psychiatric Data Contained in Records," Dr. Sultan stated:

The [sic] is substantial documentation throughout the Tennessee Department of Corrections records that Mr. Greg Thompson has suffered from significant mental illness since at least the time of his incarceration in 1985. He has been treated almost continuously with some combination of major tranquilizer and/or anti-depressant and/or anti-anxiety medications. He has received a variety of diagnostic labels including Psychosis, Psychosis Not Otherwise Specified, Paranoid Schizophrenia, Mania, Mixed Substance Abuse, Schizophrenia, BiPolar Affective Disorder, Schizoaffective Disorder, Malingering, and Adult Antisocial Behavior. This is clearly indicative of the Tennessee DOC mental health staff's view that Mr. Thompson has experienced major mental illness throughout at least most of his period of incarceration. Further, there is extensive documentation contained in these records of many episodes of bizarre aggressive and/or self destructive behavior.

(*Id.*)

Next, Dr. Sultan stated that she interviewed five individuals "who provided significant supplemental information about the life circumstances and past/present psychological functioning of Mr. Gregory Thompson." Dr. Sultan interviewed Ms. Maybelle Lamar, Thompson's maternal grandmother. Dr. Sultan reported that Lamar assumed complete responsibility for Thompson and his two older siblings after Thompson's mother was killed when Thompson was five years old. Dr. Sultan reported Lamar's description of Thompson as follows:

Ms. Lamar described Mr. Thompson as displaying significantly "different" behavior when he returned to visit her following his discharge from the U.S. Navy. "Greg didn't act the same". Unlike the 'eager to please', passive, sometimes funny gentle boy who she had reared, Mr. Thompson was "angry", "sometimes sad". "I don't think he wanted me to know what was going on with him. He mostly just stayed away from me." Ms. Lamar reported that she noticed Mr. Thompson sometimes "staring off into space" or "talking to himself". She would ask him about these behavior. [sic] "He'd deny it. He acted like he didn't know what I was talking about." Ms. Lamar recalls being quite concerned about her grandson's mental state during this time. She did not recall ever being asked questions at any time before or during Mr. Thompson's trial.

(DCTR 133 Attachment A).

Dr. Sultan also interviewed Ms. Nora Jean Hall Wharton, Thompson's older sister. Dr. Sultan reported:

Ms. Wharton described Mr. Greg Thompson as a highly sensitive, passive, timid, emotionally vulnerable child. She described a childhood of great hardship. According to her report, their grandmother, Ms. Maybelle Lamar was verbally abusive, neglectful of the

children's basic daily needs, highly critical, and unable to care properly for the children. Ms. Wharton described many instances of such abuse and neglect. She described the period following their mother's death as particularly chaotic and neglectful, recalling that often there was no food in the home and that the children would take money from under their grandmother's mattress to go and buy food. In the period following their mother's death, Ms. Wharton reported that her grandmother was continuously drunk and unable to care for her grandchildren. According to Ms. Wharton, Greg Thompson frequently witnessed his sister Nora being beaten by their grandmother.

Ms. Wharton further recalled that she and her younger brother had witnessed the brutal beating and rape of their mother by their biological father. She recalls Greg standing in the scene screaming and sobbing uncontrollably.

Of particular relevance is Ms. Wharton's recollections about Mr. Thompson repeatedly banging his head against the wall of their home on many occasions during their early childhood. This behavior frequently followed their grandmother yelling at Greg "You have the Devil in you." Mr. Thompson would tell his sister that he was attempting to "knock the Devil out" of his head in this way. Ms. Wharton recalls believing that this behavior was quite odd.

Ms. Wharton reported that Greg would frequently cry at school during the early school years, and as a result, was often the victim of intense mockery from his classmates. Because Ms. Wharton was in the same classroom as her brother she observed these behaviors and often intervened on her brother's behalf. She described Mr. Thompson's response to this abuse as quite passive.

Following his discharge from military service, Ms. Wharton described Mr. Thompson's behavior as significantly different than his prior conduct and attitude. She reported several episodes of bizarre behavior which included a sudden intense emotional reaction without obvious external provocation. Mr. Thompson would become extremely angry, would cry and scream for a lengthy period of time, would appear as if he might or actually become physically violent or aggressive, and then would suddenly retreat. Ms. Thompson reported this behavior and her concerns about it to her grandmother. Ms. Lamar suggested that Ms. Wharton take her brother to the psychiatric unit of the local hospital for treatment. Ms. Wharton did not attempt to get any treatment for Mr. Thompson and reports feeling quite guilty about this.

Nora Jean Wharton described her own struggles with mental illness throughout the past fifteen years. She has received counseling to assist her in coping with the effects of her abusive childhood and she has been treated with a combination of a major tranquilizer (Stellazine) and anti-depressant medications. She reported her younger half-sister Kim has also suffered from significant mental illness.

(DCTR 133 Attachment A).

Dr. Sultan also relayed the report of Michael Chavis, an investigator for the Federal Defenders Office of Eastern Tennessee, from his interview of Ms. Cajulao in summer of 1998.

Mr. Chavis reported that Ms. Cajulao described Mr. Thompson as displaying increasingly bizarre behavior during the latter part of their relationship. Similar to descriptions proved [sic] by Ms. Nora Wharton, Ms Cajulao reported several episodes of "paranoid" and aggressive behavior which had no apparent external

antecedent. She reported that Mr. Thompson sometimes thought that people were "after" him. He would close all the curtains in the house because he did not want the person who was "looking" for him to see him through the curtains. She remembers being quite concerned about Mr. Thompson's mental state.

Dr. Sultan next reported her "Summary and Conclusions," which we quote here in full:

Mr. Gregory Thompson has experienced symptoms of a major mental illness throughout his adult life. Indeed, there is information available which suggests that Mr. Thompson was displaying significant signs of mental illness from the time he was a small child. Self-injurious behavior is reported as early as six years old. There is extensive documentation contained within the records reviewed for this evaluation that Mr. Thompson has experienced a thought disorder and/or an affective disorder of some type for many years.

*It is my opinion that Mr. Gregory Thompson is most appropriately diagnosed, according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, as having Schizoaffective Disorder, Bipolar Type. As is typical of this illness, symptoms became apparent in early adulthood. Mr. Thompson was suffering serious mental illness at the time of the 1985 offense for which he has been convicted and sentenced. This mental illness would have substantially impaired Mr. Thompson's ability to conform his conduct to the requirements of the law.*

Further, Mr. Thompson was the victim of severe childhood emotional abuse and physical neglect. His family background is best described as highly neglectful and economically deprived. Mr. Thompson repeatedly witnessed episodes of violence during his childhood in which one family member assaulted or brutalized

another.    There are significant aspects of Mr. Thompson's social history that have been recognized as mitigating in other capital cases.

> *It is important to note that all of the information related to Mr. Thompson's early mental illness and social history was available at the time of his 1985 trial.*

*Id.* (emphases added).  Again, this report is dated July 22, 1999.[11]

### (ii.) Dr. Sultan's Deposition Testimony

The second attachment is Dr. Sultan's deposition.  Pruden, counsel for Respondent, took Dr. Sultan's deposition on July 22, 1999.  Appearing on behalf of Thompson was Stephen Kissinger.  Michael Chavis was also present.

Dr. Sultan told Respondent that she was first contacted by Chavis on behalf of Kissinger in July or August of 1998.  Dr. Sultan testified that

> A.  Mr. Chavis asked me about my availability *and asked if I would be willing to perform a psychological evaluation to assess what Mr. Thompson's psychological condition might have been like at the time of the offense in 1985, to assess whether it was possible to make such an appraisal, to see whether there were factors in his personal background that might have been investigated at the time of trial that would have had bearing on his psychological status at the time of the offense,* and Mr. Chavis also suggested that they wanted to know something about Mr. Thompson's current psychological

---

[11] The documents to which Dr. Sultan refers are not actually attached to the report.  They are attached to her deposition testimony, Attachment B, and marked as Exhibit 3 to that deposition.

state, his level of functioning at the present time.

> Q:  Were you also asked if you would be able to determine his competency at the time of his criminal trial in 1985?
>
> A:  That was not an initial question, no.
>
> . . . .
>
> Q:  Did Mr. Chavis express to you any opinion as to what he thought Mr. Thompson's psychological condition was, his mental status was, at the time of the offense?
>
> A:  The only opinion that he expressed to me was that he thought that he was not in good shape, that he had deteriorated.  He didn't label it in any particular way.  Said he didn't think that he was doing as well.

(Emphasis added.) (DCTR 133 Attachment B).

Dr. Sultan also stated that she had consulted with Dr. Crown.  She stated that Chavis told her

Dr. Crown would be conducting the neuropsychological and intellectual assessment.  Dr. Sultan testified that she needed to check Dr. Crown's test results so that she could include them in her opinion, but that she did not provide Dr. Crown with any of her diagnostic information.

When asked whether she had prepared a social history on Thompson, Dr. Sultan indicated that she had not yet but that it had been provided as part of the prison records.  Dr. Sultan testified that she had spoken with Thompson's grandmother and sister, and had attempted to speak with his brother Curtis.  She further stated that, although she had not spoken with any of Thompson's school teachers, school administrators, or

neighbors, she had reviewed testimony from them. Dr. Sultan was not sure whether she had reviewed the actual transcript from Thompson's court martial, but stated that, at a minimum, she had reviewed the testimony of at least some of the witnesses. She had not contacted any of Thompson's supervisors in the military.

Although Dr. Sultan also had not spoken with Cajulao, she interviewed Chavis, who spent several days with Cajulao in 1998. Dr. Sultan stated that she found Cajulao's observations "beneficial" in reaching her diagnosis. Specifically,

A: Ms. Cajulao described to Mr. Chavis that during the course of the four-year relationship she had with Mr. Thompson, Mr. Thompson became increasingly bizarre in behavior that he exhibited. There were a number of occasions in which there were incidents that took place in the military that he described to her as him having been attacked. The facts of the situation may in fact not be that, but that was his description to her, that he was being picked on, that he was being bullied, that he was being attacked.

He became depressed, according to her, over time and increasingly paranoid. At some point she would come home from work, and he would be in their home with the curtains drawn, standing by himself in the dark telling her that people were after him and that he didn't want people to be able to look at him through the windows. She remembers being quite concerned about his behavior.

There are a couple of situations that she described to Mr. Chavis in which, with no external provocation that she could identify, Mr. Thompson became quite violent with her,

and she saw those behaviors as very unusual for him and reported to Mr. Chavis that Mr. Thompson seemed unaware of what had provoked it and didn't even seem after the fact to remember what had taken place, would simply, after a period of time, calm himself down and return to normal behavior. I found all of that quite significant.

(*Id.* at 55-56).

Shortly thereafter, Pruden called for a break, and took that opportunity to take a look at Dr. Sultan's report. Upon return, Pruden asked Dr. Sultan:

Q: What indicates to you or what indicia are there for you that suggest Mr. Thompson was displaying significant signs of mental illness from the time he was a small child? How do you arrive at that conclusion?

A: During my interview with Mr. Thompson's sister–and let me say all of her names–Ms. Nora Jean Hall Wharton, Ms. Wharton spontaneously began to talk to me about Mr. Thompson's behavior in the time period immediately following their mother's death.

By the time of the first grade, Mr. Thompson, when he was being yelled at by his grandmother, she was reportedly verbally abusive in the following fashion: She would yell at him-- you have the devil in you, boy. She would then observe Mr. Thompson standing or sitting beside a wall repeatedly banging his head into the wall. She, in her role as protector of him, would ask him what was going on, and he would tell her he was trying to knock the devil out of his head. She recalls at

the time, although she was quite young herself, being worried about his behavior and thinking it as was very odd.

One of things that we know about people who develop thought disorders is that frequently in childhood you'll see one or more peculiarities in behavior. This would certainly fit in that category. She recalls other instances.

Q: Sort of self-punishment or a self-exorcism type thing?

A: A self-injurious behavior is what we would call it I think. Mr. Thompson, when he was Greg, in the first and second and third grade had rather frequent crying episodes in classrooms that Ms. Wharton recalls also as very unusual in the context of his schoolroom situation. She describes him as being the subject of torment on the part of the students because he behaved in an odd fashion. Sometimes he would simply begin to cry and wail and scream and apparently made a sound like a fire engine when he was sobbing and developed the nickname Fire Engine. That's reported in the trial transcript. She told me much more detail about actually the extent of those kind of emotional outbursts.

At home it was rather common for Mr. Thompson to begin to cry and scream during times when Ms. Wharton herself was being beaten by their grandmother. Ms. Wharton was the victim of physical abuse on the part of the grandmother. Mr. Thompson observed much of this since they were together virtually all of the time, and Nora Wharton was not really

permitted much interaction outside of their home.

(*Id.* at 60).

Dr. Sultan further testified that:

She [Ms. Wharton] recalled another episode during which her biological father was brutally beating and raping their mother on the floor in front of them when the children were quite small, perhaps Mr. Thompson was himself three or four. She was maybe four or five. Mr. Thompson's reaction to that was to stand and scream and scream and scream and scream during the entire episode.

Any of the–taking the self-injury aside, setting that aside, any one of those behaviors in isolation might not be particularly significant. Putting them together, we begin to see a pattern of intense emotional reactivity.

Q: So basically, if I understand it, it's the self-injurious behavior and the crying and the way you see him reacting to these physical abuses of others?

A: Yes.

Q: And that is indicative of a sign of mental illness to you? I just want to make sure that I'm understanding what you're telling me. If I'm not, please explain it to me.

A: I think I understand your question. It is an early indicator of a problem that's likely to develop. With the benefit of hindsight, it takes on the significance of a precursor, because then we see

the escalating pattern of dysfunction and abnormality.

Q: Sort of a causal relationship is what you're seeing developing?

A: I'm not sure what causes what. There are often early indices of later mental illnesses that you don't know exactly what it's going to look like later, but you realize in looking at the child that there's a high likelihood that something is not going to be right when that person achieves maturity.

Q: Because of the environment, for example, in which he's growing up?

A: Perhaps. Perhaps because of the genetics involved. Perhaps because of the situations he's exposed to, as you said, the environment. Perhaps because of whatever factors there are. Perhaps nutrition plays a role in this. These children were without food for significant periods of time as well. I don't know all of the reasons, but what I know is that if you look back in the childhood of this man, the beginnings of mental illness are apparent.

Q: Besides Ms. Wharton's report of lack of food, have you seen any evidence that the children were taken away because of malnutrition?

A: No. Ms. Wharton did tell me, however, that there was a neighbor who had planned to make a report to Social Services, so perhaps I'll have the opportunity to interview that neighbor as well.

Q: . . . You don't know to what degree the children were malnourished then?

A: No. I don't know. I do know that–and this is confirmed by the grandmother–in the six weeks approximately following their mother's death, the children were left alone virtually all of the time because Ms. Lamar was drunk and in bed, and so we have a five, a six, and a seven-year-old child in a house with no food. They would occasionally steal money from underneath her mattress while she was sleeping, and one of them would go to the store to try to find some food. Occasionally a neighbor would provide them with a meal or a can of food. I don't know whether they were malnourished over an extended period of time. I do know that there is, from Ms. Wharton's perspective, rather serious psychological damage from that time.

Q: You have no medical documentation showing any malnourished condition or that it's caused some problem with his brain, do you?

A: I don't. These children were never taken to the doctor, so there wouldn't be any medical documentation. There's probably documentation in the school system. According to Ms. Wharton, Ms. Lamar was so drunk at the beginning of the school year following their mother's death that she forgot to sign the children up for lunches at school. They didn't have anything to eat during the day, so they forged her signature on a permission slip so that they could eat. They were discovered and punished by the school superintendent people, and a form was sent home to Ms. Lamar. She then signed it, and the children were able to eat

lunch after that point. A couple weeks passed for all of that to get straightened out.

Ms. Wharton has undergone a lot of therapy in recent years and says that she's now able to describe situations that she wasn't very comfortable acknowledging to herself, these being one of them.

Q: Your diagnosis of Mr. Thompson is schizoaffective disorder, comma, bipolar type. What leads you to that diagnosis from what you've reviewed and your testing results?

A: What leads me to the diagnosis is that there is a long history, perhaps at this point almost a 20-year history, of simultaneous thought disorder on the part of Mr. Thompson documented throughout all the records, and affective disorder, emotional disorder, being unable to regulate his emotions, sometimes falling into the pits of despair and becoming suicidal, sometimes becoming highly agitated and manic and having too much energy, too much exuberance, and grandiose thinking. The thought disorder is manifested in persecutory ideas, delusions of grandeur–lots of different kinds of delusions actually–auditory hallucinations that he sometimes admits to, sometimes suspected by the doctors who are doing the examination.

The psychological testing early on in Mr. Thompson's incarceration confirm the presence of a psychotic process. There was an MMPI administered to him by a prison psychologist in 1990 that is described as valid and indicative of psychotic process, and throughout the prison record he receives a variety of diagnoses that

take into account both thought disorder and affective illness.

The very best diagnosis to describe all of the complex of symptoms that I just talked to you about is schizoaffective disorder, bipolar type.

Q: You note in your report Mr. Thompson was observed having a significant change in behavior after he was discharged from the Navy. What significance do you attach to that fact?

A: Well, it's interesting, because the state Court of Appeals actually notes this, that prior to his entry into the military Mr. Thompson is described almost uniformly–well, in fact, uniformly according to their opinion–as passive, as compliant, as eager to please, as gentle, as timid, as eager to run from attacks.

At some point–and we don't know, because I haven't seen any psychiatric records from the military at this point; I don't know if there are any–we don't know whether or not the change in Mr. Thompson is perceived as other than behavioral disruption, but, in fact, his description of that time is that he began to notice that people were trying to hurt him all the time, that officers and other people of his rank and slightly above his rank attempted to provoke him, that they sometimes physically assaulted him, that he thought he was being followed a lot, and that he sometimes struck out in what he thought was defense and then later found out from other people who he knew and trusted that there wasn't anything to defend against or that there might not have been anything to defend against.

Q: This is what he related to you during your interview last August?

A: Right. The people who saw him after the military each were struck by how very different he seemed. That was the word that kept being used, "different." Sometimes the people I was speaking to were not able to describe what different meant, but, for example, the grandmother said that he was different as in not right, that he wasn't himself. Ms. Wharton tells me that the grandmother was very well aware that he was in deep psychological distress, and, in fact, the grandmother suggested that he be taken to the psychiatric unit at Grady Hospital in Atlanta, I believe, for treatment. The grandmother observed him staring off into space for long periods of time. She observed him mumbling to himself. When she asked him what he was doing, he told her he had no idea what she was talking about. She said that was very different from the boy who left her to go into service.

The sister has even a better glimpse of him than that, because he actually went to live with her for a while, and she said he was bizarre. She described him as paranoid. She said that he would explode for no reason at all, that she was afraid of him for the very first time in her life, that they had always been terribly close, the sort of close where if there was only one piece of bread to eat they would share it, that they always looked out for one another, and that suddenly he was behaving in ways that she simply could not identify. She described three very serious episodes of aggression and emotional upset that she said are what led her to

approach her grandmother about what to do for treatment for him.

(*Id.* at 62).

Pruden then asked:

Q: You state that the schizoaffective disorder, bipolar type, would substantially impair Mr. Thompson's ability to conform his conduct to the requirements of the law. How so?

A: There are points in time when Mr. Thompson is out of contact with reality. He is responding to situations that simply don't exist or that he perceives in extremely exaggerated or different form. A person is not able to conform one's conduct to the law if you are frankly delusional or hallucinating in some way. Mr. Thompson over the years has had both of those symptoms.

Q: So it's this delusional aspect of this disorder that is the main factor that would keep him from having the ability to conform his conduct to the requirements of law, if I understand you correctly?

A: Is it the main factor? Let me say that I think it's at least as potent a factor if not more as the other aspect of his mental illness, which is that he has emotional disregulation.

Q: Meaning?

A: Meaning Mr. Thompson often is not in control of his emotions. He has episodes of rage, of aggression, that he doesn't understand or relate to very well. He's told about them later. Sometimes he remembers them, sometimes he doesn't.

(*Id.* at 69).

The deposition concluded shortly thereafter.

### (iii.) Kissinger's Affidavit

The third attachment is Kissinger's affidavit. In it, he explains in relevant part the following:

2.  I was appointed to represent the Appellant, Gregory Thompson, on January 29, 1998, by the district court.

3.  In approximately November of 1999, Ms. Leah Prewitt, the Federal Defender for the Eastern District of Tennessee, was forced by illness to cease activities on behalf of Federal Defender Services of Eastern Tennessee, Inc. Ms. Prewitt's duties were assumed by Ms. Elizabeth Ford, an Assistant Federal Defender in the office. Because Ms. Prewitt had not resigned, Federal Defender Services of Eastern Tennessee, Inc., was not able to hire a permanent replacement for Ms. Prewitt. Because Ms. Ford could not do both Ms. Prewitt's job and her own, Federal Defender Services of Eastern Tennessee, Inc. assigned a portion of Ms. Ford's caseload to affiant.

4.  Affiant, however, already had an extremely heavy capital habeas corpus caseload, including, but not limited to, Mr. Thompson's case. In fact, his capital caseload was so heavy that Federal Defender Services of Eastern Tennessee, Inc. was forced to hire a second attorney to handle capital habeas corpus cases in July of 2000. When a portion of Ms. Ford's cases were assigned to affiant, that caseload became so great that affiant made errors which, however understandable, were nonetheless errors.

5.  *Despite the affiant's efforts, there were occasions when he made assumptions, such as the assumption he*

*made regarding Respondent's filing of the report and deposition of Dr. Sultan, which were, however reasonable, incorrect. Counsel's failure to verify this assumption regarding these documents was neglect. Given the extraordinary pressure under which counsel was operating at that time, such neglect was excusable.*

And further this affiant saith not.

(*Id.* Attachment C)(emphasis added). Kissinger's affidavit is dated March 1, 2001.

### g. The District Court's Ruling on the Rule 60(b) Motion

On April 17, 2001, the district court denied Thompson's motion to reconsider the order denying his motion to alter or amend judgment pursuant to Fed. R. Civ. P. 60(b). First, the district court held that it had previously determined the Rule 60(b) motion was filed outside the one year time period. The district court noted that, according to its calculation the motion was required to be filed no later than February 16, 2001, to be considered timely. DCTR 139 (citing Fed. R. Civ. P. 6 and 60(b)). The district court then noted that:

Thompson now argues, without citing authority, that the calculation of the Rule 60(b) one-year limitation period should not begin until March 31, 2000, the date this Court denied his Rule 59 motion to alter or amend the judgment. Thompson's interpretation is contrary to the plain language of the rule. Thompson has not cited, nor has the Court found, any authority to support his position. The rule specifies that the motion should be made within a reasonable time, and in this case "not more than one year after the judgment, order, or proceeding was entered or taken." Rule 60(b) of the Federal Rules of Civil Procedure. In the case before this Court, the order dismissing the *habeas* petition was entered on February 17, 2000. [Court File No. 125].

(*Id.* at 3).

Next, the district court stated, and we quote in full, the following:

Moreover, the Court specifically noted in its memorandum opinion dismissing the *habeas* petition, that Thompson procedurally defaulted his claim that he was incompetent at the time of the crime and an the time of trial. [Court File No. 124, at 35]. ***Furthermore, when addressing Thompson's claim of ineffective assistance of counsel for failing to adequately investigate his mental health, the Court placed Thompson on notice that he failed to provide evidence of his allegations that he was incompetent at the time of the crime and trial.*** [Court File No. 124, at 53].

Petitioner claims experts recently obtained by him have revealed that he was incompetent under Tennessee law at the time of the crime and throughout his court proceedings. Petitioner has failed to state the name of the expert and failed to provide proof of these revelations. The Court has read the deposition of Dr. Crown, (Court File No. 119, Exhibit 1) but was unable to located [sic] his opinion that Thompson was incompetent at the time of the crime and throughout his court proceedings. As a matter of fact, Dr. Crown stated he was not asked to render any determination about whether or not Thompson was competent during his state trial.

*Id.* Thus, the filing of this request more than one year after Thompson was placed on notice that such information was not in the record is unreasonable and not excusable neglect.

(*Id.* at 3-4) (bold and underlining added).

**2. Appeal to this Court**

Thompson did not appeal from the order of the district court's denying his motion to alter or amend judgment. On appeal to this Court, Thompson articulated the issues for review as follows:

I.   Whether the district court erred when it reviewed Mr. Thompson's claims under the "all reasonable jurists" standard denounced by the Supreme Court in (*Terry*) *Williams v. Taylor* to summarily deny Mr. Thompson's petition.

II.  Whether the district court erred in denying Mr. Thompson's habeas petition without a hearing where Mr. Thompson did not fail to develop the factual basis of his claims in state court and whether the district court erred by making factual findings without affording Mr. Thompson the opportunity to present evidence with regards to those findings.

III. Whether Mr. Thompson received ineffective assistance of counsel in both the guilt and sentencing phases of his capital trial where counsel failed to investigate and present evidence regarding Mr. Thompson's mental illness and social history and failed to present evidence in support of a life sentence in violation of due process and the Sixth Amendment.

IV.  Whether Mr. Thompson's Fifth, Sixth, Eight, and Fourteenth Amendment rights were violated when the state withheld exculpatory evidence which clearly supported Mr. Thompson's claim of serious mental illness and its debilitating effects and presented false evidence regarding Mr. Thompson's mental

health during trial and post-conviction proceedings.

Curiously, appellate habeas counsel Dana Hansen did not appeal the denial of the Rule 60(b) motion, despite her apparent realization that Dr. Sultan's deposition testimony and report were never made part of the district court record.

### III. Discussion

### A. Procedural Posture

This case is governed by the Anterrorism and Effective Death Penalty Act of 1996, and we have already ruled on the initial habeas petition. *See Thompson v. Bell*, 315 F.3d 566 (6th Cir. 2003), *cert. denied*, 124 S. Ct. 804 (2003). However, as alluded to above, this matter is before us in a unique procedural posture, on our own motion, and prior to the issuance of the mandate.[12] Thus, we are not obliged to satisfy the requirements for the filing of a second or successive petition outlined in 28 U.S.C. § 2244. *See Workman v. Bell*, 227 F.3d 331, 334 (6th Cir. 2000) (en banc; equally divided court) (stating that "[a]s a general rule, when a mandate is recalled with respect to a petition for writ of habeas corpus, the petitioner first must satisfy the requirements for the filing of a second or successive petition as outlined in § 2244(b)).

---

[12]On July 26, 2002, Respondent-Appellee, Ricky Bell, filed a motion for reconsideration of our order filed July 26, 2002, granting Petitioner's *ex parte* motion for authorization to expand the appointment of counsel to include state court proceedings. That motion has not yet been ruled on.

Furthermore, our docket sheet reflects that, on March 14, 2003, Dana C. Hansen filed a motion to stay the mandate, and that we granted it on March 24, 2003. On December 2, 2003, Dana Hansen filed a motion to further stay the mandate, which this Court granted on December 12, 2003.

However, even if this matter were before us as a second habeas petition, it would not matter, because the AEDPA does not bar a second or successive petition premised upon fraud upon the court. *See Workman v. Bell*, 245 F.3d 849, 852 (6th Cir. 2001) ("In our equally divided opinion denying further relief for the petitioner . . ., all of the judges agreed that the court can reconsider the petition if there was a fraud upon the court.") *Cf. Calderon v. Thompson*, 523 U.S. 538, 556-57 (1998) (holding that the principles of the AEDPA apply in general to a recall of the mandate because a "State's interests in finality are compelling when a federal court of appeals issues a mandate denying federal habeas relief;" exempting claims of "fraud upon the court, calling into question the very legitimacy of the judgment"); *Workman*, 227 F.3d at 334 (stating that "[o]ne of the reasons which would justify recalling a mandate is the potential existence of a fraud upon the court"). Indeed, in *Calderon*, the Supreme Court stated that "a mandate may be recalled when it is necessary to address new circumstances before the court which are 'grave' and 'unforeseen' or which are, in other words, unforeseeable circumstances which implicate the justice of the judgment previously rendered." *Workman*, 227 F.3d at 334 n.3 (citing *Calderon*, 523 U.S. at 549).

### B. Ineffective Assistance of Trial Counsel at Mitigation

As the United States Supreme Court recognized in *Strickland*, "the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Srickland v. Washington*, 466 U.S. 668, 684 (1984). "'[T]he right to counsel is the right to effective assistance of counsel,'" *id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)), and a defendant can be deprived of that right by counsel's failure to render "'adequate legal assistance.'" *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)).

In *Strickland*, the Supreme Court held that

[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

When the duty at issue is the duty to investigate, "counsel has a duty to make reasonable investigations, or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 690; *see also id.* at 688-89. Reasonableness is determined by considering all of the circumstances. *Id.* at 688. However "[p]revailing norms of practice as reflected in American Bar Association standards and the like," are guides to determining reasonableness. *Id.*; *see also Hamblin v. Mitchell,* 354 F.3d 482, 486-88 (6th Cir. 2003) (same).

Also relevant to the question of whether the scope of counsel's investigation was reasonable is what counsel *actually* knew. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2538 (2003).

### 1. Deficient Performance

In our previous opinion we held that trial counsels' investigation was sufficient, principally because Thompson

failed to present any evidence indicated that he suffered from symptoms of mental illness at the time of the offense. *See Thompson*, 315 F.3d at 589. In other words, we could not have found ineffective assistance because there was no showing that trial counsel missed available evidence, and we were mislead by incomplete records.

According to Dr. Sultan's July 1999 testimony, Thompson was suffering from a serious mental illness at the time of the offense.[13] Moreover, "all of the information related to Mr. Thompson's early mental illness and social history [and] was available at the time of his 1985 trial." Had trial counsel adequately interviewed family members, counsel would have found that Thompson exhibited troubling behaviors from an early age. Thompson engaged in self-injurious behaviors as a young child. As a young adult, and prior to the murder, Thompson had mood swings and episodes during which he acted in a bizarre manner and appeared to lose contact with reality. He talked to himself. At times he became agitated, crying and screaming for no apparent reason. At other times, he appeared paranoid, keeping the drapes closed, fearing that he was being followed. As Dr. Sultan observed, although each instance taken alone might not be sufficient, when combined with Thompson's abnormal responses, they are indicative of an early psychopathology.

As Dr. Blair indicated at the state post-conviction hearing, a complete social and family history is critical to the

---

[13]Schizophrenia is a chronic disorder of thought, characterized by delusions, hallucinations, disorganized speech or grossly disorganized orientation or catatonic behaviors. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders pp. (rev. 4th ed. 2000) ("DSM-IV"). There is no definite laboratory or radiological test that establishes the diagnosis of schizophrenia, rather, the diagnosis is based on longitudinal historical information. As individuals with schizophrenia may not disclose the full extent of their symptoms, an evaluation for the presence or absence of schizophrenia or other psychotic disorders is not complete without a thorough social history obtained from family members or friends who have known the patient over time.

establishment of a diagnosis of mental illness. *See Thompson*, 315 F.3d at 579. Yet, according to Dr. Blair, MTMHI's records only contained sketchy information related to Thompson's history before he committed the murder. Dr. Copple's testimony indicated that he did not take a thorough history: "I did get a little bit of general information, such as his age, his education." Dr. Copple did not appear to be aware of Thompson's possible symptoms. When asked about Thompson's report of mood swings, Copple indicated that he did not believe Thompson ever had mood swings or reported them to Dr. Watson.

This readily available social and family history evidence, had trial counsel obtained it, should have been reported to experts for psychiatric evaluation. After all, it was counsel who traveled to Thompson's home town to interview family members and friends and would have had access to the information. Furthermore, the evidence was not subtle, counsel did not need any expertise in psychiatry, as even Thompson's family members were aware of Thompson's need for a psychiatric evaluation.

Trial counsel were also ineffective for failing to obtain and present a comprehensive social history. Thompson was the victim of verbal abuse and neglect of sufficient severity that by first grade Thompson was exhibiting odd behaviors. He repeatedly banged his head in response to his grandmother yelling at him. He wailed in the classroom and received the nickname of "Fire Engine" due to the unusual sound of his sobs. At age three or four, he observed his father brutally beat and rape his mother. His mother died when he was five years old and he was left with his maternal grandmother who was continuously drunk for the first six weeks and did not even provide food for the children. All of this information was powerful mitigating evidence that should have been presented to the trier of fact at sentencing. *See Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that the scope of trial counsel's investigation was unreasonable when counsel failed to investigate the petitioner's social history, including the fact

that his mother was a chronic alcoholic and that he was sent to various foster homes, factors which would have led any reasonably competent attorney to pursue); *Williams v. Taylor*, 529 U.S. 362, 395-98 (2000) (finding ineffective assistance of counsel because counsel failed to investigate and introduce readily available evidence of the petitioner's nightmarish childhood, including severe and repeated beatings by his father, and available evidence showing that the petitioner was borderline mentally retarded; also finding prejudice in that the evidence "might well have influenced the jury's appraisal of his moral culpability"); *Hamblin*, 354 F.3d at 489-91 (holding that defense counsel's representation of the petitioner fell short of prevailing standards because had counsel investigated, they would have found a large body of mitigating evidence of an unstable and deprived childhood, characterized by extreme poverty, neglect, and family violence, as well as signs of a mental disability or disorder); *Coleman v. Mitchell*, 268 F.3d 417, 451-54 (6th Cir. 2001) (finding ineffective assistance at mitigation where counsel failed to present evidence of the petitioner's horrific childhood, his mental and emotional disorders, and low IQ); *Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000) (finding ineffective assistance where counsel failed to present evidence "of a childhood in which abuse, neglect and hunger were normal").

Like trial counsel in *Wiggins*, trial counsel here had more than sufficient leads to investigate further. *Cf. Wiggins*, 123 S. Ct. at 2536-37 (holding that trial counsel's decision not to expand their investigation beyond a presentence investigation report and department of social services records which revealed facts concerning the petitioner's alcoholic mother and his problems in foster care, as well as his self-report of a miserable childhood was unreasonable). Thompson's trial counsel were aware that Thompson had exhibited possible symptoms of a mental illness. Trial counsel filed a notice of insanity defense and requested that Thompson undergo a mental evaluation. In a letter dated March 29, 1985 to Dr. Taran of Multi-County Mental Health, counsel explained that

Thompson was experiencing "extreme mood changes." Counsel also knew of Thompson's violent behaviors in the military, which were in stark contrast to Thompson's previous history. In addition, as described in the report, Thompson described hearing auditory hallucinations "all of his life" when admitted to MTMHI. As counsel testified at the post-conviction evidentiary hearing, "[t]he thing that struck me so strongly throughout this whole case was really to do with that, and that was the difference in the man when he lived in Georgia and grew up there and what kind of person he was as opposed to someone who committed–allegedly committed this act, this murder and that was a tip off that there may have been some kind of brain injury." *Thompson*, 315 F. 3d at 577. In short, trial counsel's investigation into Thompson's background did not reflect reasonable professional judgment in light of what they knew and suspected. *Cf. Wiggins*, 123 S. Ct. at 2542 (holding that trial counsel's decision to end their investigation when they did was unreasonable in light of the evidence counsel uncovered in the social service records).

## 2. Prejudice

The failure to present this mitigating evidence was prejudicial. *Cf. Wggins*, 123 S. Ct. at 2542 (holding that the petitioner's evidence of severe privation and abuse in his early life while in the custody of his alcoholic mother and physical abuse in subsequent years in foster care prejudiced his defense). As the Supreme Court stated in *Wiggins*, "Petitioner thus had the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Id.* at 2542 (and cases cited therein). Finally, as was true in *Wiggins*, "[h]ad the jury been able to place the petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 2543.

In sum, trial counsels' conduct failed to render effective assistance of counsel guaranteed by the Sixth Amendment by failing to conduct a reasonable investigation of Thompson's

social history and present powerful, readily available mitigating evidence, and by failing to pursue known leads that might have helped them to prepare their case in mitigation. In light of Dr. Blair's post-conviction testimony that a full history was needed to determine whether Thompson was schizophrenic at the time of the offense, the state court postconviction courts' denial of funds amounted to an objectively unreasonable application of *Strickland* under 28 U.S.C. § 2254(d)(1).

## C. Misconduct of Habeas Counsel

The next issue is whether Kissinger may have intentionally, or at a minimum recklessly, failed to timely and properly present critical evidence to the district court and this Court–evidence which, in the words of the district court, might have entitled Thompson to relief. Simply put, the question is this: how and why did habeas counsel fail to timely and properly present Dr. Sultan's expert opinion testimony that "Mr. Thompson was suffering serious mental illness [Schizoaffective Disorder, Bipolar Type] at the time of the 1985 offense for which he has been convicted and sentenced. This mental illness would have substantially impaired Mr. Thompson's ability to conform his conduct to the requirements of law." Psychological Report prepared by Dr. Faye Sultan, dated July 22, 1999.

This matter is somewhat reminiscent of *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993).[14] There, on its own motion, this Court vacated the judgment of the district court denying the petitioner's writ of habeas corpus upon finding that the judgments in the underlying extradition proceedings were wrongly procured as a result of prosecutorial

---

[14]Although *Demjanjuk* involved misconduct by federal prosecutors, I see no reason why defense attorneys should not be held to a similar standard of integrity, especially when defense counsel are federal defenders specializing in habeas and capital cases.

misconduct that constituted fraud on the court.[15] *Id.* at 356. As in *Demjanjuk*, we must decide if "the conduct outlined herein constitutes fraud on the court or attorney misconduct sufficiently serious to require corrective action on our part." *Id.* at 352.

As we observed in *Demjanjuk*, fraud upon the court "is a somewhat nebulous concept," defined as embracing

> only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct.

*Id.* (quoting 7 *Moore's Federal Practice and Procedure*, ¶ 60.33)). *See also Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 245 (1944) (holding that fraud upon the court generally involves a deliberately planned scheme to subvert the integrity of the judicial process). Cases dealing with fraud on the court usually turn on whether the improper actions involved the parties alone, or whether the attorneys in the case were also involved. *Demjanjuk*, 10 Fd. 3d at 352. As we further observed in *Demjanjuk*, "[a]s an officer of the court, every attorney has a duty to be completely honest in conducting litigation," and that

> while an attorney should represent his client with singular loyalty, that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary

---

[15]Specifically, we found that attorneys for the Department of Justice Attorneys "acted with reckless disregard for the truth and for the government's obligation to take no steps that prevent an adversary from presenting his case fully and fairly" when they withheld exculpatory materials from the petitioner. *Demjanjuk v. Petrovsky*, 10 F.3d 338, 354 (6th Cir. 1993).

his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates fraud upon a court.

*Id.* at 352 (quoting 7 James Wm. et al., Moore's Federal Practice ¶ 60.33). Finally, we remarked that "[a]lthough there are cases holding that a 'plan or scheme' must exist in order to find fraud on the court, we agree . . . that a scheme, based on a subjective intent to commit fraud, is not required in a case such as this. Reckless disregard for the truth is sufficient." *Id.* at 352-53 (holding that Department of Justice Attorneys committed fraud on the court by failing to disclose to the courts and to the detainee exculpatory information in their possession).

*Demjanjuk* defined fraud on the court as consisting of (1) conduct by an officer of the court, (2) directed towards the judicial machinery itself, that is (3) intentionally false, wilfully blind to the truth or is in reckless disregard for the truth, is (4) a positive averment or concealment when one is under a duty to disclose, and that (5) deceives the court. *Id.* at 348.

The first and second fraud on the court factors appear to be easily met. Thompson's attorneys are clearly officers of the court, *see generally Hickman v. Taylor*, 329 U.S. 495, 510 (1947) (noting that "[h]istorically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients"), and their representation of Thompson in these habeas proceedings was and is clearly directed at the judicial machinery of the court.

The fourth and fifth factors also appear to be present. Habeas counsel for Thompson had an obligation, as part of their duty to represent zealously their client, to present to the court material, critical, *available* evidence, which in this case would virtually have ensured the relief Thompson requested

in his federal habeas corpus petition. This meant presenting, by affidavits or otherwise, proof of Thompson's mental illness at the time of the offense in response to Respondent's motion for summary judgment. *See* Fed. R. Civ. P. 56(e) (stating that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party"). *See also* Fed. R. Civ. P. 56(c) (stating that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law"). If counsel knew that it had positive, mitigating proof in the form of an expert opinion that Thompson suffered from a mental illness at the time of the offense such that it would have substantially impaired his ability to conform his conduct to the requirements of the law–information that the district court specifically indicated in its discovery order might entitle Thompson to the relief he requested–then that information should have been presented in response to Respondent's motion for summary judgment so as to prevent the grant of summary judgment in Respondent's favor and against Thompson.

Here, both the district court and this Court were deceived. That is, both courts assumed that probative evidence as to Thompson's mental illness at the time of the crime did not exist because counsel failed to present it.[16] Based on the natural assumption that such evidence did not exist because

---

[16]This seems to be a pretty natural assumption, given counsel's obligation to zealously represent their client.

it was not presented at the summary judgment stage, the district court held that

> Thompson has failed to provide any significant probative evidence which would make it necessary for this Court to resolve a factual dispute. . . . Thompson has not provided this Court with anything other than factually unsupported allegations that he was incompetent at the time he committed the crime and at the time of his jury trial. Nor has Thompson provided this Court with any significant probative evidence that Thompson was suffering from a significant mental disease that should have been presented to the jury during the punishment phase as mitigation evidence.

> Petitioner had two different psychological evaluations and both resulted in findings of competency at the time of the crime and at the time of trial.

Memorandum Opinion dated February 17, 2000, at 54-55.

This Court labored under the same misimpression that there was no evidence to establish that Thompson suffered from a serious mental disease or defect at the time of the offense:

> Moreover, not one of Thompson's post-trial experts have opined that Thompson suffered from organicity or mental illness at the time of the crime or trial. Blair, Thompson's state post-conviction expert, also a clinical psychologist with ties to Vanderbilt, declined to give an opinion, stating simply that more information was needed. Significantly, she did not fault the testing procedures used by MTMHI or Copple, but merely stated that they were not extensive enough. Indeed, she performed many of the same tests. *Similarly, neither Crown nor Sultan ever expressed an opinion that Thompson was mentally ill at the time of the crime. In fact, Crown stated that he was not asked to render such an opinion. . . . On the other hand, Crown found*

*Thompson competent in June 1998, which is consistent with Copple's findings and the MTMHI evaluation in 1985.*

*Also, as the district court found, Thompson failed to submit any medical records or proof* **to any court** *that he actually sustained the alleged head injuries or that they resulted in any permanent damage. Further, he has never submitted* **to any court** *any proof that he suffered from severe mental illness at the time of the crime.*

*Thompson*, 315 F.3d at 589-90 (emphases added). That is not all we said:

Counsel has now had numerous opportunities via expert testimony to establish that Thompson suffered from organic brain disease or mental illness at the time of the crime. *And yet, at each opportunity, counsel fails to secure an answer to the critical issue of whether Thompson was mentally ill at the time of the crime.* In essence, counsel is attempting to rely on*, as proof,* two inferences: 1) because Thompson allegedly suffered head injuries, he must have suffered brain damage, and 2) because he is currently suffering from schizo-affective disorder, he must have been suffering from mental illness at the time of the crime. But inferences are not proof, as even Thompson's experts seem to recognize, for each and every one fails to automatically take the leap from these inferences to the conclusion that he was mentally incompetent at the time of the murder. *However, absent some evidence of organic brain damage or mental illness at the time of the crime, trial counsel cannot be deemed ineffective for failing to discover something that does not appear to exist.* As we held in *Lorraine v. Coyle*, 291 F.3d 416, 436 (6th Cir. 2002), "[i]t simply cannot be said that trial counsel's conduct fell below an objective standard of reasonableness under *Strickland* simply because the leads [of possible brain damage] led nowhere."

. . . .

Thompson has not presented any evidence of incompetence at the time of the crime or trial in either the state or federal proceedings. As previously noted, none of Thompson's experts have stepped up to the plate on the key issue of Thompson's competence at the time of trial.

*Id.* at 590-92 (emphases added).

In short, both the district court and this Court were mislead into believing that significant mitigating evidence of Thompson's mental illness at the time of offense did not exist. It quite clearly did exist, *and that evidence was in habeas counsel's possession*, via Dr. Sultan's July 22, 1999 report and July 22, 1999, deposition, prior to the filing of Thompson's response in opposition to Respondent's motion for summary judgment, which Thompson filed on July 29, 1999 (DCTR 86), and prior to Thompson's filing of Supplemental Brief in Support of Response in Opposition to Respondent's Motion for Summary Judgment, on September 14, 1999.[17] (DCTR 104).

This leaves the third factor. Here the question is whether habeas counsel's conduct in failing to present available evidence of Thompson's mental illness at the time of the crime was intentionally false, wilfully blind to truth, or in reckless disregard for the truth. In his affidavit attached to Thompson's Rule 60(b) motion, Kissinger states that "an extremely heavy capital habeas corpus caseload, including, but not limited to, Mr. Thompson's case" caused him to make

---

[17]In his opposition to Respondent's motion for summary judgment, Thompson asked the court for an order allowing him to file a brief in regard to the issues of exhaustion of state remedies. The district court granted Thompson's request via written order on September 8, 1999, directing Thompson to file his brief no later that Tuesday, September 14, 1999.

"errors," thereby suggesting that his conduct in this matter was negligent and not intentional or in reckless disregard for the truth.

Our incredulity over this explanation stems from a simple premise: how could counsel possibly forget or overlook *the* critical piece of evidence–i.e., an expert opinion that Thompson suffered from a significant mental disease or defect at the time of the offense–that both trial and habeas counsel purportedly sought for over a decade in both the state and federal courts, and which habeas counsel obtained at the very latest (but obviously much sooner) seven days prior to the filing of Thompson's response to Respondent's dispositive motion?

Virtually *every pleading* in both the state and federal proceedings is directed toward this end. Within two months of the murder, trial counsel requested a mental evaluation of Thompson to determine his mental capacity at the time of the crime. Within three months of the murder, trial counsel filed a supplementary motion for a psychiatric examination and a neurological examination to determine if Thompson was suffering from a mental illness on the date of the offense. Less than three months after the offense, Thompson was referred to the Multi-County Mental Health Center for a forensic evaluation to make that determination, and a week later the trial court entered another order directing Thompson to undergo a forensic evaluation at MTMHI.

Trial counsel were not content with the state's evaluation and requested funds to hire an independent psychiatrist. They ultimately hired Dr. Copple. Dr. Copple examined Thompson principally to see what he would be capable of doing in a prison setting and did not perform a thorough review of Thompson' social history. Amazingly, habeas counsel faulted trial counsel's choice of Copple because he did not conduct a thorough review of Thompson's family history and medical background.

In his petition for post-conviction relief in state court, Thompson claimed that trial counsel failed to adequately investigate his background for the existence of mitigating evidence, and sought to hire a licensed psychologist or psychiatrist and an investigator. Attached to that request was the affidavit of Dr. Gillian Blair, a clinical psychologist, who specifically stated that if Thompson were suffering from a neurological or psychological impairment bipolar affective disorder or schizoaffective disorder, it was likely that some degree of that impairment would have existed at the time of the offense and would have been a significant factor in determining whether Thompson could have conformed his conduct to the requirements of law. Dr. Blair stated that Thompson needed a full psychological evaluation. She testified to the same effect at the state post-conviction hearing. The state post-conviction court denied Thompson funds, however.

On appeal to this Court, habeas counsel asserted that the state post-conviction courts placed Thompson in a Catch-22 situation by denying them the funds needed to obtain the requisite expert opinion and then finding no ineffective assistance because there was no proof in the record that counsel failed to present any available evidence of a mental disease or defect. And habeas counsel went out and hired a neuropsychologist and a clinical psychologist. Dr. Sultan conducted the very examination and evaluation that Dr. Blair outlined was necessary but could not provide because of lack of funds. Dr. Blair stated that "the most important thing that would be necessary would be a full history and full medical records of Mr. Thompson prior to the commission of the offense." She further indicated that from her limited review, Thompson's social history, his childhood and upbringing were "sketchy."

Dr. Sultan found the "other facts" Dr. Blair indicated would be necessary to develop an opinion as to Thompson's condition at the time of the offense. In her report, Dr. Sultan stated that she "initiated a very extensive review of legal,

military, medical, prison, and psychiatric/psychological records." Dr. Sultan also interviewed several individuals who provided significant information about Thompson's childhood and family background, including Thompson's grandmother, older sister, and a girlfriend. These witnesses revealed an abusive, traumatic childhood and clear signs of schizophrenia onset in early adulthood prior to the offense. Based on that review, Dr. Sultan opined that Thompson displayed significant signs of mental illness from the time he was a small child and manifested symptoms of schizo-affective disorder in early adulthood, prior to the 1985 offense.

The principal bases for Thompson's petition and amended petition for writ of habeas corpus were his allegations that trial counsel were ineffective for: (1) failing to perform a reasonable investigation of his background and mental health history; (2) failing to secure adequate expert assistance regarding his mental health; and (3) failing to reasonably investigate and challenge Thompson's competency at the time of the offense. Thompson also claimed he was denied funding for mental health and investigative experts during the state trial and post-conviction proceedings.

Thompson's initial witness list represented that Dr. Crown would testify that Thompson's brain damage, as well as his medical and social history, are consistent with schizophrenia. The initial witness list further indicated that Dr. Sultan would testify that Thompson suffers from schizophrenia and did so at the time of the offense. Moreover, from the outset habeas counsel represented to the district court, through the pleadings, that Thompson would establish that trial counsel failed to present available mitigating evidence. Indeed, the district court's November 1998 ruling affirming the magistrate judge's November 2, 1998, discovery order explicitly stated that if the facts were developed to show that Thompson's mental health should have been introduced as mitigating evidence, Thompson might be entitled to relief.

Despite the representations in his initial witness list, as Respondent discerned on July 20, 1999, Dr. Crown had no opinion as to Thompson's mental state at the time of the offense. In other words, at the time of Dr. Crown's deposition, eight months after the initial witness list was filed and several days before Thompson's response to the summary judgment was due, Dr. Crown had not been asked to form an opinion on the issue he was purportedly retained to evaluate and the key issue in the case. Dr. Crown's deposition testimony *verifies that habeas counsel never asked him to render an opinion as to Thompson's mental state at the time of the murder*. Furthermore, even though Dr. Crown concluded that Thompson had a schizo-affective disorder, which he acknowledged tends to develop in late adolescence to early adulthood, and which he further acknowledged appeared to have begun in the last stages of Thompson's military career, Dr. Crown stated that he was not asked, and had not pinpointed, the onset date.

In contrast, in the initial witness list, Petitioner stated that Dr. Crown would testify that he had "been provided with background information regarding Petitioner's medical and social history," and "administered a battery of indicated neuropsychological tests," which would "indicate that Petitioner suffers from organic brain damage." The witness list further represents that Dr. Crown would testify "that the brain damage observed, as well as Petitioner's social and medical history, is consistent with schizophrenia," and that "Petitioner's brain damage substantially impaired the ability of the Petitioner to distinguish between right and wrong and/or to conform his conduct to the requirements of the law." The disparity between Dr. Crown's actual deposition testimony and the witness list is patent.

Less clear is why habeas counsel did not ask Dr. Crown for an opinion on Thompson's mental status at the time of the offense. Habeas counsel's attempt, in response to Respondent's motion for reimbursement of deposition costs, to shift the burden of procuring such an opinion from Dr.

Crown to Respondent, is absolutely audacious.   Habeas counsel actually argued that Respondent had the burden of procuring that opinion from Dr. Crown.  How ironic that habeas counsel would suggest that procuring such expert opinion testimony was somehow the Warden's burden, given that habeas counsel equally faulted defense trial counsel for failing to procure and present same.  We have a hard time believing that, on the brink of summary judgment, habeas counsel somehow got confused over who had the burden in the habeas proceeding of proving ineffective assistance of trial counsel.

More outrageous is Kissinger's representation on behalf of his client in that same response that Dr. Crown's statement substantially conformed to the information contained in the initial witness list because Dr. Crown stated "in passing" in his deposition that Thompson suffers from a bipolar disorder of a self-afflicted type and that the onset of this affliction was prior to the alleged offense.  As review of Dr. Crown's deposition testimony makes clear, Dr. Crown stated Thompson has a schizo-affective disorder, which typically occurs in early adulthood, but Dr. Crown also made clear that he was not asked to opine whether Thompson actually manifested symptoms prior to the offense and further stated that he had "no real pinpoint."

Again we cannot escape the irony of Kissinger's assertions in that motion that Respondent either made "a strategic decision" not to procure Dr. Crown's opinion regarding Thompson's mental health at the time of the offense, or that Respondent "forgot to do so." [18]

---

[18]Also disturbing was habeas counsel's parallel motion for reimbursement costs for the deposition of Dr. Blau.  Habeas counsel scheduled that deposition prior to the depositions of Drs. Crown and Sultan, knowing full well that all the information Respondent had was what habeas counsel had stated in the initial witness list.   Such gamesmanship, on the eve of the due date of Thompson's response to Respondent's motion for summary judgment, is inexcusable.

Most troubling of all, of course, is the presence and substance of Dr. Sultan's testimony. Dr. Sultan conducted the background investigation, interviewed Thompson's family members and  provided the *exact* diagnosis that habeas counsel claims trial counsel was under a constitutional obligation to discover and present.  And she provided the service *at Kissinger's request.* The record reflects that habeas counsel were in communication with Dr. Sultan as early as August 1998.  In an affidavit signed on February 10, 1999, attached to Thompson's ex parte motion for a temporary mandatory restraining order, Dr. Sultan alleged that she had reviewed hundreds of pages of records and documents about Thompson's psychiatric, military, and legal history, and had first met with Thompson on August 20, 1998.  Kissinger, through Chavis, asked Dr. Sultan for that opinion, received a report with that exact conclusion on July 22, 1999 and heard Dr. Sultan testify to that effect on July 22, 1999.  After all, Kissinger was counsel of record for Thompson at Dr. Sultan's deposition.  How then could counsel fail to include any mention of Dr. Sultan's expert opinion in Petitioner's response brief to Respondent's motion for summary judgment?  It is virtually inconceivable to think that counsel could overlook this information as he was preparing the response to the summary judgment motion.  Dr. Sultan's deposition testimony and accompanying report were obtained a *mere seven days before the brief was filed*.  How could counsel possibly forget about its best evidence, and in such a short span of time?

Habeas counsel's conduct following the district court's issuance of its opinion granting summary judgment to Respondent seriously undercuts the  possibility that habeas counsel's account is believable.  On March 2, 2000, two weeks after the district court granted summary judgment to Respondent *in an opinion which explicitly stated that Thompson had failed "to provide this Court with any significant probative evidence that Thompson was suffering from a significant mental disease that should have been presented to the jury during the punishment phase as*

*mitigating evidence,"* Thompson filed a motion to alter or amend judgment. Habeas counsel claimed that it filed that motion "[i]n an effort to fulfill his duty to both his client and the Court." Yet the motion does not attempt to present the "forgotten" evidence, Dr. Sultan's opinion. Instead, it merely presented two clarifying arguments. Ironically, habeas counsel stated that while not waiving or conceding any of the other arguments previously raised, the motion centered on these two issues because they went "to the very integrity of the judicial process." If counsel's "failure to remember" Dr. Sultan's testimony, after a pointed reminder by the district court that "Petitioner had two different psychological evaluations and both resulted in findings of competency at the time of the crime and at the time of trial," is not reckless disregard for the truth, what is?

And habeas counsel apparently continued to forget about Dr. Sultan's opinion. Habeas counsel waited still another year to bring this information forward. And it waited for a year from the district court's denial of Thompson's motion to alter or amend judgment, not one year from the date of the underlying judgment. As the district court pointed out, this motion was untimely, because the plain language of Rule 60(b) sets an absolute time limit on the motion of one year in addition to the requirement that the motion be filed within a reasonable time. Fed. R. Civ. P. 60(b). The district court therefore lacked the authority to grant relief. *See Ackerman v. United States*, 340 U.S. 193, 197 (1950) ("A motion for excusable neglect as provided in Rule 60(b)(1) must, by the rule's terms, be made not more than one year after the judgment was entered."). Again, we find it curious that habeas counsel's remembrance of depositions past came just a hair too late to fit within the parameters of Rule 60(b).[19]

_____

[19]As reflected in its order denying Petitioner's motion to alter or amend judgment, the district court obviously sensed that something was amiss, but its hands were tied by counsel's strategic choice to file an untimely Rule 60(b)(1) motion.

Then, for the first time, counsel offered to supplement the record with Dr. Sultan's report and deposition testimony upon its enlightened view that "Dr. Sultan's opinions certainly are directly relevant to the mental health related claims," and further acknowledgment that "[c]ounsel for Mr. Thompson engaged in Dr. Sultan's services *for the sole purpose of offering her opinion to support his constitutional claims.*" Habeas counsel argued excusable neglect based on a heavy caseload and a disorderly office, and further stated that Kissinger "was under the mistaken belief" that the evidence was in the record. In a footnote, Kissinger further explained his "mistaken belief" as follows: Because Respondent had placed Dr. Crown's deposition testimony and accompanying report in the record, as part of its motion for reimbursement costs, and because Respondent had moved for costs in hiring its own mental health expert, Dr. Blau, on the grounds that Blau's services were unnecessary as Petitioner had no experts to support the mental health related issues, Kissinger apparently assumed that *Respondent* would also have included the deposition testimony and report of Thompson's only other mental health expert to bolster its request for deposition costs.

This explanation makes little sense. In the first place, Dr. Sultan's deposition testimony and accompanying report, unlike Dr. Crown's, do support the mental health related allegations and is consistent with the witness list statement. More importantly, Kissinger's explanation seeks to obscure the fundamental fact that Thompson's habeas counsel had an independent responsibility to both Thompson and the court to present Dr. Sultan's opinion in Thompson's opposition to Respondent's motion for summary judgment, and ultimately, to meet Thompson's burden of establishing that he was entitled to the requested relief, a grant of the writ of habeas corpus based on constitutional error. Kissinger's attempt to shift the "blame" to Respondent is *in*excusable.

Furthermore, habeas counsel's filing of an obviously untimely Rule 60(b) motion can be conceived of as "a fraud

perpetrated . . . so that judicial machinery cannot perform in the usual manner." That is precisely what happened in this case. The district court was prevented from administering full justice because it lacked all of the vital information necessary to afford the proper relief.

As exhaustively detailed above, the essence of Thompson's claim *throughout the entire course of the state and federal proceedings* was that he was suffering from a mental disease or defect at the time of the offense. Habeas counsel *criticized trial counsel for failing to procure this evidence,* and was aware from the outset how it needed to establish ineffective assistance of trial counsel at mitigation, as reflected by its early decision to retain Drs. Crown and Sultan. Habeas counsel then did exactly what it faulted trial counsel for failing to do.[20] That is, habeas counsel conducted the investigation that it alleged trial counsel were constitutionally ineffective for failing to perform. That investigation revealed that Thompson was suffering from a serious mental illness at the time of Brenda Lane's murder. It also revealed significant aspects of Thompson's social history long recognized as mitigating in other capital cases. This Court simply cannot, at this juncture, accept counsel's explanation that it forgot to remember that critical evidence until slightly one year after judgment. There appears to be no acceptable excuse for habeas counsel's behavior.[21]

---

[20] Trial counsel cannot be faulted for relying on the evaluation of a credentialed expert which was entirely consistent with the evaluation of an inpatient psychiatric team specializing in forensics that also concluded Thompson was not mentally ill. Nonetheless, as previously discussed, trial counsel's failure to investigate and present Thompson's social history provides an independent basis for finding ineffective assistance of counsel at mitigation under *Wiggins*.

[21] We can only assume that habeas counsel planned to unveil Dr. Sultan's opinion on the eve of Thompson's execution. Judge Moore differs, concluding that "more than likely, a genuine mistake was made, one which was not realized until a different attorney looked at the case.

### IV. Response to Majority Opinion

The majority opinion agrees that Dr. Sultan's opinion requires us to vacate the district court's grant of summary judgment in favor of respondent. However, it posits that my opinion "goes too far in its accusations of fraud on the court;" on the grounds that "while his [my] explanation for the omission of the Sultan deposition from the official record before the court is possible in the narrowest sense, the power of this court should not be used to make such accusations without more definite proof than the factual record of this case reveals." Rather, the majority would find that the more plausible explanation is that "a genuine mistake was made, one which was not realized until a different attorney looked at the case," and that "[t]o conclude otherwise is to disbelieve sworn testimony by an officer of the court."

The majority opinion correctly recognizes that, at this juncture, I am inclined to disbelieve Kissinger's representations of excusable neglect because I find it utterly implausible that counsel could forget about his most important piece of evidence, expert testimony assessing Thompson's mental state at the time of the crime, given that

---

To conclude otherwise is to disbelieve sworn testimony by an officer of the court, and to assume that habeas counsel conspired to conceal evidence beneficial to their client, for no discernible reason."

Once again, if one reminisces, the capital case of *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001) (first habeas petition), and *In re Byrd*, 269 F.3d 544 (6th Cir. 2001) (successive petition) comes quickly to mind. There, habeas counsel sat for twelve years on an affidavit by a codefendant that allegedly would have established petitioner Byrd's actual innocence, and did not file their second habeas petition introducing the evidence and "actual innocence" argument until one week before the petitioner's scheduled execution date. On this basis, a majority of the judges in regular active service invoked the inherent equitable powers of the court to stay the petitioner's execution and remand the matter for the development of a factual record. *See In re Byrd*, 269 F.3d 585 (6th Cir. 2001). So there may be a rational, strategic, calculated reason for habeas counsel's purported negligence.

his principal strategy throughout the habeas proceedings was to claim Sixth Amendment ineffective assistance of counsel based on trial counsel's failure to obtain that very evidence. From day one, habeas counsel knew that in order to make a successful constitutional challenge, he had to acquire an expert opinion to the effect that Thompson was suffering from schizophrenia at the time of the offense, as reflected by the fact that counsel hired two experts who would purportedly say that. Furthermore, even assuming short-term memory loss due to a crushing workload, Kissinger sat through Dr. Sultan's deposition a mere seven days before he signed and filed the response to the summary judgment motion. On the eve of its filing, how could he, how did he, forget what Dr. Sultan said, and utterly fail to make the slightest allusion to her expert opinion–especially since she provided precisely what he needed to support his ineffective assistance claim?

Even assuming that Kissinger innocently suffered from virtual amnesia during this critical phase of the federal district court proceedings, and appellate habeas counsel Dana Hansen caught the error when she took over the appeal and tried to correct it, why then did she fail to appeal the district court's denial of the Rule 60(b) motion or otherwise seek to supplement the record on appeal under Fed. R. App. 10(e) given the obvious importance of that testimony and the gravity of the situation before us?[22]

---

[22] I am also troubled by the fact that in Thompson's petition for writ of certiorari, signed by Dana C. Hansen Chavis, as counsel of record for Petitioner, Hansen refers to Dr. Sultan's opinion regarding Thompson's *as if it were properly presented to the district court and made part of the record*. In that brief, Hansen Chavis represents as follows:

> Thompson's habeas corpus alleged ineffective assistance of trial counsel via the failure to adequately investigate and obtain adequate expert assistance regarding Thompson's mental health at the time of the offense and failure to direct an expert inquiry into mental health mitigation and to obtain adequate expert assistance regarding Thompson's mental health at the time of the offense and failure to direct an expert inquiry into mental health mitigation and to obtain rebuttal evidence against the State's

psychiatrist. Respondent moved for summary judgment, asserting only that the claims were either procedurally barred or the state court decision was not contrary to or an unreasonable application of federal law (Apx. 442) because Dr. Blair had not offered a final opinion on Thompson's mental health at the time of the offense (which, of course, she was prevented from doing by the post-conviction court's denial of funding). Respondent further asserted Thompson was not entitled to present further evidence in support of his claims in a federal court evidentiary hearing. Thompson responded to the summary judgment motion by asserting that he had not failed to develop the factual basis of his claim; instead, the state court had, through the after-the fact application of procedural rules governing the appointment of experts in state post-conviction cases, prevented him from fully developing his claim in state court and that he was therefore entitled to an evidentiary hearing to present further evidence in support of his claims.

When the district court issued its decision granting Respondent's motion for summary judgment, however, it by-passed Respondent's argument as well as Thompson's response and instead held that the claim would be denied because Thompson had failed to present affidavits or other evidence (Apx. 711). The district court never provided Thompson with notice of its intention to rely on this ground nor did it provide him with an opportunity to present such evidence prior to entering judgment against him. Thompson had such evidence in his possession and, contrary to the findings of the district court, most of it was in the record.

Habeas counsel had a neuropsychologist, Dr. Barry Crown, examine Thompson. The result was a finding of organic brain damage, secondary to schizo-affective disorder, bipolar subtype. (Apx. 711).

. . . .

Additionally, forensic psychologist Dr. Faye Sultan reported:

> It is my opinion that Mr. Gregory Thompson is most appropriately diagnosed, according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, as having Schizoaffective Disorder, Bipolar Type. As is typical of this illness, symptoms became apparent in early adulthood. Thompson was suffering serious mental illness at the time of the 1985 offense for which he has been convicted and sentenced. This mental illness would have substantially impaired

Thompson's ability to conform his conduct to the requirements of the law.

Further, Thompson was the victim of severe childhood emotional abuse and physical neglect. His family background is best described as highly neglectful and economically deprived. Thompson repeatedly witnessed episodes of violence during his childhood in which one family member assaulted or brutalized another. There are significant aspects of Thompson's social history that have been recognized as mitigating in other capital cases (R. 133, Attachment A, Sultan report, p. 6).

*Despite this unrebutted expert testimony the district court noted from the trial court record that "[t]he team at Central State concluded there was no organicity (brain damage) and Dr. Copple [the industrial psychologist] found no indication of brain damage" (Apx. 701) and ruled, due to a lack of affidavits "Thompson has failed to provide any significant probative evidence which would make it necessary for this Court to resolve a factual dispute" (Apx. 711). The petition was dismissed.*
Thompson's Petition for Certiorari, p.14-16 (emphasis added).

Hansen also represented that:

The district court engaged in fact finding to grant Respondent's motion by crediting the opinions of Respondent's experts over Thompson's experts and by disregarding the findings of Thompson's experts that he was psychotic when he committed the offense (Apx. 657). The district court also did not give Thompson an opportunity to correct certain fundamental misconceptions upon which the district court's decision was based. The district court erred further by making findings that were unsupported or contradicted by other evidence, and drawing inferences adverse to Thompson, contrary to well-settled summary judgment standards.

*Id.* at 24.

Further, Hansen asserted that:

The district court disregarded the rulings of Thompson's experts–in particular Dr. Blair's opinion that Thompson likely was schizophrenic when he committed the offense, Dr. Sultan's opinion that Thompson suffers from schizo-affective disorder and that his mental problems began while he was in the military–*i.e.* long before the offense. Instead the court cursorily concluded Thompson had not provided "any significant probative evidence that Thompson was suffering from a significant mental disease that should have been presented to the

Kissinger's and Hansen's unusual performance is, and should be criticized as, inadequate, and should not escape close judicial scrutiny. Both of these attorneys are federal defenders, specializing in death penalty cases. If their conduct was negligent, then perhaps they should not perform this kind of work in the future. If their conduct was something more than that, then appropriate disciplinary action should be taken. Furthermore, my and the majority opinion's disagreement over the proper characterization of this conduct is precisely why there is a need for the district court or a duly-appointed Special Master to conduct a full evidentiary hearing on this issue to ascertain the truth.

The majority opinion correctly states that we could not consider Dr. Sultan's deposition testimony because it was not made a part of the record before the district court, and beyond the scope of our appellate review. *See Lippi v. City Bank*, 955 F.2d 599, 604 (9th Cir. 1992). *See also United States v. Barrow*, 118 F.3d 482, 487 (6th Cir. 1997) (stating that, "[i]n general, the appellate court should have before it the record and facts considered by the District Court"); *cf. Sovereign News Co. v. United States*, 690 F.2d 569, 571 (6th Cir. 1982) (stating that "[a] party may not by-pass the fact-finding process of the lower court and introduce new facts in brief on appeal"). Furthermore, appellate habeas counsel did not file a Fed. R. App. P. 10(e) motion to supplement the record [23]

---

jury during the punishment phase as mitigation evidence." *Id.*
*Id.* at 28.

In short, the brief before the United States Supreme Court accuses the district court of ignoring probative evidence *that it did not even have before it in any form* when it granted summary judgment to Respondent.

[23] Federal Rule of Appellate Procedure 10(e) allows the appellate record to be supplemented "if anything material to either party is omitted from or misstated in the record by error or accident." Fed. R. App. P. 10(e). It " is clear from the rule's wording [that] '[t]he purpose of the rule is to allow the [ ] court to correct omissions from or misstatements in the record for appeal, not to introduce new evidence in the court of

nor make any reference to Dr. Sultan's July 1999 testimony in the appellate brief.[24]   Nor did appellate habeas counsel

---

appeals.'" *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012 (6th Cir. 2003) (quoting *S&E Shipping Corp. v. Chesapeake & O. Ry. Co.*, 678 F.2d 636, 641 (6th Cir. 1982) (alteration in original). Dr. Sultan's July 29, 1999 testimony and accompanying report do not qualify as omissions from the record because Kissinger never referenced her expert opinion on the issue of Thompson's mental status at the time of the offense; i.e., he did not rely on that evidence as part of meeting Thompson's burden under Fed. R. Civ. P. 56.

[24]Thompson's appellate brief, prepared by Dana C. Hansen, provides merely that:

> Mr. Thompson then filed a petition for writ of habeas corpus under 28 U.S.C.A. § 2254 (West 2000), claiming *inter alia* ineffective assistance of trial counsel via the failure to obtain adequate expert assistance regarding Mr. Thompson's mental health at the time of the offense.  Respondent moved for summary judgment while conceding that this point was properly cognizable on its merits (R. 82: Motion for Summary Judgment, p. 18-19; Apx. 442).
>
> The defense then had another specialist, Dr. Crown, examine Mr. Thompson.  The result was a finding of organic brain damage, secondary to schizo-affective disorder, bipolar subtype. (R.124: Memorandum, p. 54; Apx. 711).

Final Brief of Appellant, Gregory Thompson, p. 14.

Later, Hansen asserted on behalf of Thompson that

> [t]he district court clearly weighed the *partial* testimony of Drs. Crown and Blair versus that of the state experts and made findings of fact in favor of Respondent. (*Id.* at 53-54; Apx. 710).  This is improper at the summary judgment stage. *Anderson, supra*.  The district court did not view the facts in the light most favorable to Mr. Thompson to determine whether any "genuine issue of material fact" appeared on which a reasonable fact-finder could return a verdict for Mr. Thompson.

*Id.* at 42.

*Hansen* never *mentions Dr. Sultan's name or refers to her opinion in the brief.*

However, Hansen makes ample reference to Dr. Sultan's testimony and report in Thompson's petition for rehearing.  *See* Gregory Thompson's Petition for Rehearing and Suggestion for Rehearing *En banc* In a Capital Case, pp. 12-22.  In fact, in support of the assertion that Thompson presented evidence that he was mentally ill at the time of the

---

appeal the district court's 60(b) ruling.  It is disingenuous for the majority opinion to suggest that we "had" the deposition before us at the time of the initial review and therefore had not just recently "unearthed" it.  Indeed, had the deposition had been properly placed before this Court, we could have exercised our equitable powers at that time.  Our previous decision was based on the absence of the evidence.  The only reason we have it now was because I conducted an independent review of the record.

The majority opinion holds that we can exercise our inherent equitable power to supplement the record on appeal. Here I agree, because I feel that the "special circumstances" of this case–a fortuitous discovery that, if left unaddressed, will result in a grave miscarriage of justice–justifies our invocation of this authority.   Indeed, by reviewing Dr. Sultan's opinions on the merits and altering the opinion, that is what I did in my capacity as a judicial officer.  However, our inherent equitable authority to review material that was never reviewed by the district court to right a very grave wrong in this case should not immunize Kissinger's and Hansen's professional performance from further examination. Thus, although it provides a separate basis for jurisdiction, those inherent equitable powers should not be used to cover up potentially fraudulent conduct by counsel on the court by federal habeas counsel.  Again, though, this matter needs a thorough examination in the district court.

Finally, if further investigation into the attorneys' conduct here is not pursued, this could create dangerous precedent. That is, it virtually invites habeas counsel to save their best

---

crime and trial, Hansen, presented, *inter alia*, ample quotations from and references to Dr. Sultan's testimony and report, attached to Thompson's Rule 60(b) motion.  She failed to indicate, however, that said evidence was not properly presented to the district court, and therefore never part of the record for review to this Court.  She did not indicate that she failed to appeal the district court's Rule 60(b) ruling.  She did not invoke the inherent equitable powers of the Court.

evidence for last, thereby undermining principles of finality and the AEDPA. And, at the same time, it potentially encourages counsel to engage in risky strategy, because there is no guarantee that any given panel of the Sixth Circuit will bypass the strict procedural and substantive requirements of the AEDPA simply because the matter happens to involve the death penalty. Here, but for the chance discovery of the Sultan affidavit, this matter could have gone in a different direction, and Thompson might well have been executed as scheduled on August 19, 2004.[25]

### V. Conclusion

In the face of this record, Kissinger's explanation is implausible, and if not intentionally false, most certainly appears to be in reckless disregard for the truth. Meanwhile, a man's life hangs in the balance. As in *Demjanjuk*, we have "acted pursuant to our inherent power to protect the integrity of the judicial process within this Circuit." *Demjanjuk*, 10 F.3d at 356. *Cf. Hazel-Atlas Glass Co.*, 322 U.S. at 244 (recognizing a court's inherent power to grant relief, for "after-discovered fraud," from an earlier judgment, "regardless of the term of [its] entry"). As part of the order of remand, I would instruct the district court to conduct full evidentiary hearings on both the issue of ineffective assistance of counsel at mitigation and fraud upon the court.

---

[25]Meanwhile, Gregory Thompson has been facing the true specter of the death penalty since at least January 9, 2003. For this fundamental reason, I feel that habeas counsel's performance was truly, horribly, ineffective.